UNITED STATES of America,
Plaintiff–Appellee,

v.

James BADGER, Roscoe Foreman, Marcia F. Ivy, and Mariano "Mario" Lettieri, Defendants–Appellants.

Nos. 90–3223, 90–3245, 90–3252, 90–3659, 91–2460.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 11, 1992.

Decided Jan. 21, 1993.

As Corrected Feb. 25, 1993.

Rehearing and Rehearing En Banc Denied Feb. 26, 1993.

Jacqueline Oreglia, Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellant.

Jeffrey B. Steinback, Terence P. Gillespie, Geena D. Cohen, Leonard Goodman (argued), Genson, Steinback, Gillespie & Martin, Chicago, IL, for Mariano M. Lettieri.

Jack P. Rimland (argued), Stamos, Rimland, Halprin & Clark, Chicago, IL, for Marcia F. Ivy.

Rick Halprin (argued), Chicago, IL, for Roscoe Foreman.

Richard F. Walsh (argued), Chicago, IL, for James G. Badger, Jr.

Before BAUER, Chief Judge, MANION, Circuit Judge, and MOODY, District Judge.[*]

BAUER, Chief Judge.

This case is a direct criminal appeal by four defendants: James Badger, Roscoe Foreman, Marcia Fay Ivy, and Mariano Lettieri. These four defendants and a fifth defendant were named in an eighteen-count superseding indictment that charged nine individuals with a conspiracy to distribute and possess heroin and cocaine, plus related crimes. Three counts of the indictment were dismissed, and the five defendants proceeded to trial. All were convicted of the remaining counts with which they were charged. After trial, the district court granted the fifth defendant judgement of acquittal due to insufficient evidence. The four remaining defendants have been joined in this consolidated appeal. Badger, Foreman, and Ivy appeal their convictions. Lettieri appeals both his conviction and sentence, as well as denial of his emergency motion for a new trial. We affirm.

## I.

Nedrick Miller, a thirty-year veteran of the Chicago Police Department, was neither serving nor protecting when he conducted a drug sales and distribution operation while managing a west-side Chicago apartment building from late 1987 through April 1989. In addition to his own operation, Miller earned $500–600 weekly for allowing Michael "Ice Mike" Gomire to sell cocaine around the clock from the building, the Washington Pine Apartments ("the Pines"). (Trial Transcript "Tr." 342–49). Gomire rented as many as ten apartments at one time (Tr. 294), using them to process and sell drugs. (Tr. 345). A number of other people also worked in the building. Annette Daggs was the desk clerk (Tr. 292), Marcia Fay Ivy cleaned apartments and common areas (Tr. 1364–65), and Howard Lucas was the janitor. (Tr. 95).

Lucas got a second job when his pay was cut by the building owner. At that time, Miller put him in touch with Gomire, who put Lucas to work breaking down kilograms of cocaine ("kilos") into one ounce quantities. (Tr. 102). After a few months, someone involved in the drug organization learned that Lucas had traded bags of cocaine in exchange for sex. (Tr. 105). When Miller found out, he told Gomire to have Lucas beaten. (Tr. 361). Lucas left town to recuperate, and upon his return he worked for Miller, rather than Gomire, picking up drugs. (Tr. 107). Lucas sometimes picked up drugs from Mariano "Mario" Lettieri (Tr. 108), who owned Mario's Butcher Shop and Food Center ("the butcher shop") located near Miller's building. (Tr. 1260). Lucas picked up drugs from Lettieri on at least three occasions. The first time, he met Lettieri at a suburban sandwich shop and picked up a kilo. (Tr. 109–12). On another occasion, he accompanied Miller to meet Lettieri and picked up another kilo at a suburban cemetery (Tr. 112–15), and a third time he picked up several ounces of Karachi heroin from the butcher shop. (Tr. 115–18).

In the summer of 1988, Miller and Lettieri were at Loretto Hospital, where Miller and Gomire held a meeting while Lettieri looked on from another room. Miller invited Gomire to participate in a consignment sale of Lettieri's cocaine. (Tr. 349–53). Gomire agreed, and the three men began a joint operation to sell cocaine from the Pines. Gomire and Miller sold three to

[*] The Honorable James T. Moody, United States District Judge for the Northern District of Indiana, is sitting by designation.

four kilos on consignment for Lettieri. (Tr. 353–56). Each kilo brought about $50,000 on the street. Usually $8000 of that was spent on "expenses" such as money lost in police raids and sandwiches for the workers. Miller and Gomire divided the remaining $42,000 into $1000 bundles. Lettieri's share was $29,000, which was delivered to him at the shop. Miller and Gomire kept the balance for themselves. (Tr. 354–55).

The Government learned of these activities, and in late 1987, the United States Drug Enforcement Administration ("DEA") began investigating Miller and the drug operations at the Pines. (Tr. 493). In September 1988, DEA Special Agent Van Quarles went undercover with the help of a confidential informant called Top Cat or TC. (Tr. 160). Agent Quarles portrayed a drug trafficker from Grand Rapids, Michigan called "Little Wolf". (Tr. 159–61). The "Little Wolf" cover worked, and Quarles arranged to buy cocaine from Miller. (Tr. 217–50). Daggs acted as Miller's mouthpiece, and Quarles worked through her at Miller's instructions. (Tr. 171). Despite that, Quarles met with Miller on two occasions. (Tr. 167, 172). At one of those meetings, Miller generously lent Quarles advice on how to best run a drug trafficking operation. (Tr. 172–73). At both meetings, Miller related details about losing $30,000 of Karachi heroin. (Tr. 168, 175). Quarles successfully purchased cocaine on four occasions, picking up the drugs from Daggs. (Tr. 218, 221, 231, 236). Little Wolf tried to set up a fifth cocaine purchase during January and February 1989, but Daggs told him that the cocaine sources had dried up. (Tr. 243).

Attempts to buy cocaine for resale to Little Wolf brought Marcia Fay Ivy into the picture. (Tr. 368, 1386). To the drug operators at the Pines, Ivy was known as Iyesha.[1] In February 1989, Ivy telephoned Roscoe Foreman, a Chicago attorney, and James Badger, a co-owner of a towing company (Tr. 959–60), and asked them to supply her with cocaine. (Tr. 1386–92). Foreman had met Ivy through his brother-in-

law, and knew her as Eleanor McKinney (Tr. 804), or Bay–Bay. (Tr. 809).[2] Foreman and Ivy struck up a social and business relationship. At times, Foreman and his former wife would socialize with Ivy and her cousin. In addition she babysat his children, cleaned his house, and taught his wife to cook. (Tr. 758, 804, 809). Ivy was also a cousin to one of Badger's business partners, who introduced them. Badger also knew her as Eleanor McKinney (Tr. 962), and in 1988, she worked for Badger in a side business he had selling clothing. (Tr. 962–63).

The DEA listened to Ivy's conversations with Foreman and Badger; Miller's telephones had been tapped. (Tr. 499–502). They heard four of Ivy's conversations—two each with Foreman and Badger—arranging drug transactions. In the first conversation between Ivy and Badger, Ivy asked Badger how much it would cost her to get a "key" (kilo) from his suppliers. Badger replied "nineteen" or "nineteen five". (Govt.Exh. Tape No. 22). In drug circles, these prices were understood to mean a cost of nineteen or nineteen and a half thousand dollars per kilo. (Tr. 520). In the second conversation with Badger, Ivy called to confirm the price. (Govt.Exh. Tape No. 25).

Ivy's conversations with Foreman were similar. In the first one, Ivy asked Foreman whether he could get a "half a key" and what it would cost. Foreman indicated he would check. (Govt.Exh. Tape 24). In the second conversation, Foreman told Ivy he could get the cocaine, and it would cost "eleven dollars". (Govt.Exh. Tape 26). Eleven dollars, in the course of a drug transaction, is short form for eleven thousand dollars. (Tr. 521).

Ivy, Badger, and Foreman testified at trial. Ivy testified that she was only pretending to arrange drug deals, and alluded to a "caper" she was going to "pull off". (Tr. 1374–1393). That caper allegedly was a plan to steal Little Wolf's money as she had done on a previous occasion to another

---

1. Ivy took the name Iyesha Ali when she began following Islam. (Tr. 1328).

2. Ivy's birth name was Elnora Yvonne McKinney. (Tr. 1328).

drug dealer. Both Foreman and Badger testified that they knew Ivy was pretending and they were simply humoring her. Foreman stated that he believed Ivy to be coming into money for some reason (Tr. 821–28), and Badger testified that he believed Ivy was pretending to act as a go-between for a drug deal but instead would "rip-off" the drug dealer by keeping the money and not delivering the drugs. (Tr. 964–65).

Co-conspirators Lucas, Gomire, and Daggs testified for the prosecution. The jury returned guilty verdicts on all counts, and the defendants were subsequently sentenced. The only challenge to the sentences comes from Lettieri, who received 190 months imprisonment followed by five years of supervised release. The case did not end, however, after sentencing.

In an unusual turn of events, Lettieri filed a motion for a new trial because Gomire recanted his trial testimony in a sworn affidavit. Gomire stated that while he was in Cook County jail on an attempted murder charge, he was asked by a Chicago Police officer to give information about Gomire's activities with Miller and Lettieri. Gomire averred that he felt threatened by the officer when he told him that he [Gomire] had no illegal dealings with Lettieri. Because of this alleged threat, Gomire claimed that he implicated Lettieri in the conspiracy and testified against him at trial in an effort to "protect [Gomire's] own best interests". Shortly after the recantation, Gomire was transferred to federal custody. Once there, he met with government attorneys and the trial judge and told them he had lied in the affidavit.

A special hearing was held to unravel the issues. At the hearing, Gomire recanted his recantation. He related that the attempted murder charge for which he was in jail resulted from a shooting where Gomire and a gang member exchanged gunfire after arguing about Gomire's trial testimony. (Hearing. Tr. 161). While in prison for the attempted murder, Gomire said that he was beaten up by gang members for being in violation of the gang's code. The violation, Gomire was told, was testifying against his co-defendants. (Hearing. Tr. 164–66). Not long after he was beaten up, Gomire was given an article from a prominent local magazine stating that Gomire and two others were planning to murder a prominent gang member. This article caused Gomire to fear retaliatory acts by members of the same gang. (Hrg.Tr. 166–67). Gomire testified that after these incidents, he was approached by an inmate (the same one who delivered the article) and was told that Lettieri was on the telephone and wanted to talk to him. Gomire talked to Lettieri, who asked him to change his story and contradict his trial testimony. (Hrg.Tr. 169–70). Gomire agreed; as a result, his girlfriend received several large cash payments and groceries from Lettieri's associates. (Hrg.Tr. 6, 9, 11–18).

The district court considered the hearing testimony and determined that Gomire's affidavit was false, and denied the motion for a new trial. Lettieri's appeal of this denial was consolidated with the convictions already appealed.

## II.

*Ivy, Foreman, and Badger:*

A. *Sufficiency of the evidence of conspiracy:*

■ Foreman and Badger argue that the evidence is insufficient to establish their membership in the conspiracy. To be successful, the defendants must show that when viewing the evidence in the light most favorable to the government, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The essential elements necessary to find a conspiracy are a combination or confederation of two or more people that is formed for the purpose of committing, by their joint efforts, a criminal act. *United States v. Whaley,* 830 F.2d 1469, 1473 (7th Cir.1987), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988).

The defendants cite *United States v. Townsend,* 924 F.2d 1385 (7th Cir.1991), to

support their arguments. In *Townsend*, we held that mere sale or purchase of drugs is not enough to join a conspiracy, but if a drug supplier knows of, and has an interest in, the redistribution of the drugs by the co-conspirator, then he has joined the conspiracy. *Id.* at 1390–91. In *United States v. Auerbach*, 913 F.2d 407 (7th Cir. 1990), this court held that to prove a conspiracy, the government must present enough evidence to show that the defendant knew of the conspiracy and intended to join its criminal purpose. *Id.* at 414–15. In *Auerbach*, we stated that if the defendant knew or had reason to know that other retailers were involved in a broad distribution and retail sale of narcotics, and believed that his or her benefits depended on the success of the venture, then the jury could find that the defendant agreed to participate in the overall scheme. *Id.* at 415 (quoting *United States v. Grier*, 866 F.2d 908, 924 (7th Cir.1989)). "Evidence of mere association with conspirators, knowledge of a conspiracy, and presence during conspiratorial discussions, without more, will not do the trick." *United States v. Paiz*, 905 F.2d 1014, 1020 (7th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991).

■ Foreman argues that at the very most, the conversations establish a buy-sell agreement. He argues that the taped conversations do not establish Foreman's knowledge that Ivy was buying for Miller and that Miller was going to resell the drugs. Against this argument, Miller can be heard in the background of the tape answering Foreman's question about what quantity of cocaine was needed, and asking Ivy to ask Foreman what the price was for a half kilo. The jury listened to the tape and from that could determine whether Foreman was going to buy drugs to sell to Ivy, with knowledge that those drugs were being purchased specifically for Miller because they were in the quantity Miller requested. The tapes are direct evidence of a conspiracy, and the jury could reasonably conclude that Foreman had a stake in Ivy's ability to resell the drugs to Miller, and was to benefit from Ivy and Miller's continued resale.

■ We are not limited to a review of direct evidence when considering if the evidence at trial was sufficient. "[W]e will continue to … accept circumstantial evidence as support, even sole support, for a conviction." *United States v. Durrive*, 902 F.2d 1221, 1229 (7th Cir.1990). With that in mind, we consider that throughout his testimony, Foreman discussed his familiarity with Ivy's drug problems (Tr. 811–15), and that he knew Ivy lived and worked in a drug infested apartment building. He testified that Ivy told him "it's drugs everywhere, it's people lined up from the doorway all the way up the stairs, and the line getting drugs is like a supermarket." (Tr. 819–20). With all this, it would not be unreasonable for the jury to conclude that Ivy was not merely pretending to arrange a drug purchase when she called Foreman, and that Foreman knew or should have known that the large quantity of drugs Ivy sought to buy were for further distribution through the Pines network.

Similarly, Badger argues that the telephone conversations, considered in the light most favorable to the government, establish only a buy-sell agreement between him and Ivy. Again, Miller can be heard in the background of the tape discussing with Ivy the quantity and quality of drugs he wanted her to get from Badger. Also, at one point Ivy vouches for the individual who was supplying the money for the transaction—Miller. (Govt.Tape Exh. 22). From these conversations the jury could reasonably conclude that Badger knew that Ivy was buying for the purpose of redistributing the drugs. The evidence presented against both Badger and Foreman is sufficient under *Townsend*, *Auerbach*, and *Durrive*.

Ivy also challenges the sufficiency of the evidence linking her to the conspiracy. She argues that when considered in the light most favorable to the government, the evidence establishes only that she was either a potential buyer or a broker for drug transactions. Without consummation of the transactions, Ivy claims that the holding in *United States v. Manzella*, 791 F.2d

1263 (7th Cir.1986), bars her conspiracy conviction. This argument misconstrues *Manzella.* In that case, the defendant brokered a four-cornered drug transaction. An undercover DEA agent negotiated to buy a kilogram of cocaine from a person named Rizzo. Rizzo looked to the defendant, Manzella, to get the kilo. Manzella, in turn, telephoned someone to arrange purchase and delivery of the cocaine. Much to Manzella's displeasure, the cocaine never arrived. The government prosecuted Manzella for possession with intent to distribute, and for conspiracy to commit that crime. We reversed Manzella's conviction for possession (but not for conspiracy) because Manzella never possessed—constructively or otherwise—the cocaine. Ivy attempts to read into *Manzella* a requirement that the transaction must be completed to uphold a conspiracy conviction. *Manzella* simply does not establish such a rule. In fact, we noted that ample evidence existed to prove Manzella's role in the conspiracy, despite the fact that the only cocaine transaction contemplated never came to fruition. *Id.* at 1265. Ivy's conviction fits squarely under *Manzella.*

*B. Prosecutorial misconduct:*

■■■ Ivy and Foreman argue that the prosecutor's comments in his rebuttal argument at the close of the trial regarding "Elmo" were improper and violated their constitutional due process rights. When analyzing allegations of prosecutorial misconduct during argument, we look at the disputed remarks in isolation to determine if they are proper. If the statements are proper, our analysis ends. If the statements are improper our second step is to look at the remarks in light of the entire record to determine if the defendants were deprived of a fair trial. *United States v. Gonzalez,* 933 F.2d 417, 430 (7th Cir.1991). We consider 1) the nature and seriousness of the prosecutorial misconduct, 2) whether the prosecutor's statements were invited by conduct of defense counsel, 3) whether the trial court instructions to the jury were adequate, 4) whether the defense was able to counter the improper arguments through rebuttal, and 5) the weight of the

evidence against the defendant. *United States v. Pirovolos,* 844 F.2d 415, 425 (7th Cir.), *cert. denied,* 488 U.S. 857, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988) (citing *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986)); *United States v. Neely,* 980 F.2d 1074, 1084 (7th Cir. Nov. 18, 1992). These factors carry varying weight depending on the facts of each case.

■ Applying these principles, we look at the circumstances surrounding this case. Elmo was a drug dealer with whom both Foreman and Ivy were familiar. (Tr. 823, 1357). DEA Special Agent John Riley testified that he and his partner Agent William Maloney dispatched another DEA agent to locate Elmo after hearing reference to him in the Foreman–Ivy telephone conversation. In the course of this search, the agent visited Foreman's office on north Michigan Avenue in Chicago. This office suite belongs to a company that leases it to a variety of businesses. The company provided an office and conference room to Foreman on a part-time basis, received calls for him, and relayed messages to him at his home. (Tr. 801, 1138–39). The investigating agent was not available to testify at trial, so Agent Riley testified in his stead. He stated that when the agent inquired whether Elmo was there, the receptionist told the agent that he was not, but would be returning shortly. (Tr. 705). The prosecutor incorrectly recounted this testimony in his rebuttal argument. He stated that the agent telephoned Foreman at his office and that the call was received at the Michigan Avenue location or automatically transferred to Foreman's Hyde Park home, then answered by someone who said that Elmo would be right back. (Tr. 1675–76). Foreman's attorney vociferously objected to the prosecutor's account, asked for a sidebar, and moved for a mistrial. (Tr. 1676–77). The court did not rule on the motion at that time, but it did tell the jury that a dispute had arisen as to what the evidence had shown, and instructed the jury to consider what they had heard and disregard any argument that conflicted with that evidence. Although we find no

record of the district court ruling on the mistrial motion, it is apparent that the motion was denied.

The prosecutor misstated the evidence. The misstatement could lead the jury to some unsupported inferences. First, that Elmo, an acknowledged drug dealer, worked for, or was closely associated with, Foreman. Second, that both Foreman and Ivy were lying when they testified that the Elmo reference in the telephone conversation was not specifically about a person, but rather about the secondary meaning the name Elmo had developed—"devil". (Tr. 823, 1440–41). Third, that Ivy was lying when she testified that she knew little about Elmo, and did not know where to find him. (Tr. 1423). No acceptable inferences can be drawn from the misstatement. *See Pirovolos*, 844 F.2d at 424–25; cf. *Neely*, at 1086.[3] For these reasons, the misstatement was improper.

Our second inquiry is whether the improper statement rendered the trial fundamentally unfair or substantially influenced the outcome in relation to Foreman and Ivy. The statements are considered in context of the entire trial. First, we do not believe the prosecutor intentionally misstated the testimony about Elmo. Next, the prosecutor ceased this line of argument when the defense objected. Also, immediately following the objection and side-bar, the trial court instructed the jury to disregard any statement of the evidence that did not comport with what was presented at trial. (Tr. 1678). On the other hand, the prosecutor's comments were not invited by the defense, and the defense did not have an opportunity to address the jury following the misstatement of the evidence.

The final factor is the weight of the evidence against both Foreman and Ivy. The cornerstone of Foreman's and Ivy's convictions were the tapes. The tapes re-vealed that Elmo was only a potential source of the cocaine, and Foreman was going to talk to his "other partner" about getting the drugs, rather than dealing with Elmo. (Govt.Tape Exh. 24). Elmo's identity was not an essential element of proving Foreman's and Ivy's role in the conspiracy. In addition, Agent Riley's testimony regarding Elmo was second-hand, and the defense countered that testimony effectively when questioning witnesses about the procedures followed by Foreman's office leasing company. (Tr. 801–03; 1138–40). With regard to Ivy, Gomire testified to her involvement in the drug transactions. (Tr. 368). We believe that the weight of the evidence is heavy against Foreman and Ivy, and that the misstatement regarding Elmo was not enough to have affected the jury verdict. In sum, although the prosecutor's comments were not invited, and the defense could not re-address the jury following those comments, we find that the misstatement did not violate the defendants' constitutional due process rights or substantially affect the outcome of the trial.

■ Foreman and Ivy also challenge the prosecutor's assertion made after the misstatement of facts in the rebuttal. They contend that the prosecution improperly invoked government prestige to strengthen its case when the prosecutor asked the jury whether the unavailable agent would risk his job, reputation, pension, and criminal charges to make up false statements about Elmo. The prosecutor answered his own question "Absolutely not. It makes no sense." (Tr. 1676). This statement, when considered in isolation, is an improper vouching for the credibility of a witness. *United States v. Swiatek*, 819 F.2d 721, 731 (7th Cir.) cert. denied, 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987).

**3.** In *Neely*, the several defendants were convicted of an insurance fraud scheme in which they faked car accidents and reported phantom injuries to collect insurance proceeds. Defendant Ben Isreal's physician testified that the Isreal's injuries were ambiguous. In closing argument, the prosecutor made a comment that could be understood as stating that Isreal's injuries were faked because the other defendants also faked their injuries, and therefore Isreal conspired with the other defendants. The prosecutor's comments, however, could be understood in another way. The statement could also be a challenge to the weight of the defendant's medical evidence. In light of the alternate interpretation, we held that the prosecutor's comments were not improper.

Because the prosecutor's statements about the agent were improper in isolation, we must then consider the statements in the context of the trial to determine whether they were invited by the defense. If the defense strikes the first blow, then the prosecutor's response is within the bounds of proper argument. *Auerbach*, 913 F.2d at 419 (citations omitted). The government argues that its comments were invited when defense counsel attacked the unavailable agent's account of what happened during the Elmo investigation. Defense counsel stated during closing argument:

> That's false evidence. It's a false report. It didn't happen. And they did it, or this agent did it, and he mislead Riley because they got a little desperate about what is going on in this case. They know it's thin, too. That's why Riley's own agent tricked him. It doesn't matter as to what his motive really was; the government had time for rebuttal and you didn't see this guy get on the stand and tell you about that, did you? That it was a mistake? Or tell you, "Yeah, I went up there and this is what really happened." Oh, no. He isn't going to get up on the stand because he got caught. And that is a very significant event.

(Tr. 1578–79). The comments in Foreman's closing argument invited the prosecution's response during rebuttal, therefore the prosecutor's remarks were within the bounds of proper argument.

4. Section 843(b) states:
   It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing to or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter. Each separate use of a communication facility shall be a separate offense under this subsection. For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities useful in the transmission of ... sounds of all kinds and includes ... telephone ... communication.

5. Rule 608(b) states in relevant part:
   **(b) Specific instances of conduct.** Specific instances of the conduct of a witness, for the

*C. Sufficiency of the "telephone" evidence:*

■ Finally, Badger and Foreman argue that the evidence was insufficient to prove their conviction under 21 U.S.C. § 843(b).[4] We have already addressed both Badger's and Foreman's challenges to their conspiracy convictions. Now, we simply determine if they knowingly and intentionally used the telephone to facilitate the conspiracy. The question is easily resolved. The government introduced tapes of Ivy's conversations with Badger and Foreman. The parties do not dispute that they participated in the telephone conversations. They acknowledge they discussed drug deals. The only dispute is to whether they were just playing games with Ivy or truly conspiring. The jury concluded that they were conspiring. The evidence supporting the Section 843(b) convictions is clearly sufficient.

*Mariano Lettieri:*

*A. Prosecutorial misconduct:*

■ In his first challenge to his conviction, Lettieri argues that repeated acts of prosecutorial misconduct denied him a fair trial. Initially, he claims the government improperly questioned him about a prior misdemeanor crime to which he pleaded guilty. Defense counsel moved in limine to bar questions about that crime. (R. 257). The basis of the motion was Fed.R.Evidence 608(b) and 609(b). Those rules establish how and when unrelated convictions may be used to attack the witness' credibility.[5] Our review of the record reveals no

purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness....
   Rule 609 states in relevant part:
   **(a) General rule.** For the purpose of attacking the credibility of a witness,
   **(b) Time limit.** Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date,

ruling on the motion in limine. Counsel did not file any further documents asking for a ruling, nor did counsel object when the questions were posed. Lettieri challenges the cross examination questions as improper pursuant to Federal Rules of Evidence 404(b) and 609(b).[6] When Lettieri filed his motion in limine, it did not include a Rule 404(b) challenge. Because no ruling was made on the motion in limine and because no contemporaneous objection was made at trial, we review for plain error.[7] *United States v. Brantley*, 786 F.2d 1322, 1327–28 (7th Cir.), *cert. denied* 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986).

Lettieri puts a unique spin on the issue, claiming that plain error occurred not merely by admitting the testimony, but rather, that plain error occurred because the district court did not give the jury a limiting instruction. He cites *United States v. DeGeratto*, 876 F.2d 576, 584 (7th Cir.1989), to support this proposition. *DeGeratto* involved a prosecution against a grocer, DeGeratto, who allegedly stole meat shipments. During the course of the trial, DeGeratto's business partner was being investigated by federal prosecutors for an alleged prostitution operation, unrelated to the stolen meat shipments. DeGeratto was called to testify before the grand jury about his partner's activities. The grand jury testimony was available to the prosecutors, who relentlessly questioned DeGeratto at his own trial about his role in the unrelated prostitution operation. No evidence linked DeGeratto to the prostitution operation, but the government argued that a prostitution conspiracy existed, and that DeGeratto was a part of it. We held that the government's line of questioning and argument was completely improper. We determined that the improper questioning prejudiced the trial, and reversed DeGeratto's conviction and ordered a new trial. Our decision made clear that the trial court's failure to instruct the jury to disregard the prostitution argument was merely part of the mix that added to the prejudice.

Although Lettieri's prior crime was a misdemeanor offense more than ten years old and concerned stolen goods (not drugs), the government justifies their questions about the crime because they reflect on Lettieri's honesty and integrity. Rule 608(b) allows cross examination of the witness about prior instances of misconduct that reflect on the truthfulness of that witness. Lettieri was asked the "prior crime" questions after he was asked whether he was "against thievery". When Lettieri answered that he was against thievery, the prosecution sought to impeach Lettieri's credibility.[8] The questions

unless the court determines, in the interests of justice, that the probative value of the conviction supported by the specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

6. Rule 404(b) bars admission of evidence of other crimes to prove the bad character of a person in order to show the person acted in conformity with that bad character.

7. Omission of the Rule 404(b) argument in the motion in limine requires us to consider it under a plain error standard anyway. *See United States v. Brown*, 948 F.2d 1076, 1081 n. 9 (8th Cir.1991).

8. The colloquy between the prosecutor and Lettieri was as follows:

Q: Mr. Lettieri, you indicated that you are anti-drugs, is that correct, sir?
A: Yes, I am, sir.
Q: Are you also against thievery?
A: Thievery?
Q: Yes, sir.
A: What do you mean by that?
Q: Well, are you against people who steal things?
A: Yes. Probably. Yes, I am.

      \*    \*    \*    \*    \*    \*

Q: But you consider yourself an honest man, is that correct?
A: Yes, I do.
Q: Isn't it true, sir, that you were not only arrested, but convicted of delivering a stolen computer in 1979?

      \*    \*    \*    \*    \*    \*

A: That was reduced to a misdemeanor, and I got one year supervision.
Q: Sir, answer the question, if you can.
A: Okay. Yes. Yes.
Q: You were not only charged with that—it as a felony charge—but you plead [*sic*] guilty

were not improper under these circumstances, but even if they were, the exchange between the prosecutor and Lettieri did not render the trial fundamentally unfair, unlike the exchange in *DeGeratto*. Also, in this case the judge had no reason to offer a limiting instruction because the defendants did not object contemporaneously to the questioning.

■ The testimony about the prior theft offense neatly lead the prosecution to a line of questioning fleshing out whether Lettieri had dealt in stolen goods with Miller. When asked, Lettieri answered "no", but the prosecutor persisted in trying to link Lettieri to this activity. (Tr. 1262–65).[9] This testimony is not justified under either Rules 404(b) or 608(b). Nor did these questions serve to impeach Lettieri's prior testimony. No evidence in the record supports an inference that Lettieri and Miller dealt in stolen goods. No proper justification existed for admission to this line of questioning. The defense, however, did not object. Again we review for plain error. Although the prosecutor did not abort this line of questioning when Lettieri said "no,"

the colloquy did not reach the same level of intensity as did the questioning in *DeGeratto*. Also, Lettieri had an opportunity to counter the testimony through redirect examination, other witnesses, and closing arguments. In addition, the strong weight of the evidence was against Lettieri. Lucas and Gomire both gave damning testimony against Lettieri. Moreover, Daggs' testimony about Miller delivering large sums of cash to Lettieri substantiated Lucas' and Gomire's testimony. We do not find plain error in the prosecutor's line of questioning.

■ The government also pursued another line of questioning that Lettieri challenges on appeal. The prosecutor asked Lettieri if he knew a person named John Latham. When Lettieri answered that he did not know Latham, the prosecutor then asked Lettieri if he had sold drugs for Latham. Again, Lettieri answered "no". (Tr. 1265). No objection was lodged, so as before, we review for plain error. These were the only two questions posed to Lettieri about his link to John Latham. Latham

to doing what the State's Attorney's Office charged you with, isn't that correct, sir?
A: Yes.
Q: That was delivering a stolen microcomputer?
A: I didn't deliver anything.
Q: Well, that's what you're charged with.
A: Right, but I didn't deliver anything.
Q: And you plead [*sic*] guilty to that offense?
A: Right. If you would let me explain what happened, the reason why?
Q: Well, your answer is yes, you plead [*sic*] to that offense?
A: I guess I have to say "Yes".
Q: Now, sir, that was not the first time, or the last time that you were involved in delivering or selling stolen goods, isn't that right, sir?
A: When was the second time?
Q: Well, what *is* your answer, yes or no?
A: I would have to say "No".
Q: So, that was the last time, in the late '70s, when you were involved in delivering a stolen piece of merchandise, is that correct?
A: I guess so. 1970, yes.
(Tr. 1257–58).

9. The colloquy between Lettieri and the prosecutor was as follows:
Q: Isn't it true that you were dealing in stolen goods, in addition to drugs, with Mr. Miller?
A: No, sir.

Q: Well, sir, isn't it true that in the middle of March of 1989, Mr. Miller advised you that about $56,000 worth of jewelry and that type of thing—money—had been stolen out of his apartment?
A: Mr. Miller called me the day that he got robbed—which you have transcript and a tape, if you want to play it—called me at work saying, "Did you send somebody here, mother-fucker, to rob me?" He was, I guess, joking. I said, "What's going on? What are you talking about?" He says, "Well, somebody came in and stole everything that I got." He said, "Well, if anybody comes to your store trying to sell you a ring, a gold bracelet watch" this and that "let me know or hold him." Being on the west side of Chicago, you know that people are always trying to sell something, all day long.
Q: And you buy it, isn't that right?
A: No, I don't.
Q: Isn't it true that you buy stolen cameras, stolen VCRs?
A: No, I don't.
(Tr. 1262–65). The colloquy continued, apparently trying to establish that Lettieri is a fence, providing an outlet for stolen merchandise.

was not otherwise identified, and the questions were completely secondary to the issues that the jury were to consider. We do not believe that during the course of a two week trial, these two questions about a secondary issue reach the level of plain error.

■ Lettieri raises various other claims of prosecutorial misconduct. He states that the government improperly questioned Lucas about his plea agreement, and later when the prosecutor referred to that testimony during the closing argument, Lettieri claims the prosecutor improperly vouched for Lucas. Defense counsel did not object to the testimony, and our review is for plain error. *Swiatek*, 819 F.2d at 731. During the trial, Lucas testified only that he was required to tell the truth or face a perjury prosecution, and that the maximum penalty he faced for the charges to which he pleaded guilty was forty years. This was not improper under our holding in *United States v. Creamer*, 555 F.2d 612, 617 (7th Cir.), *cert. denied*, 434 U.S. 833, 98 S.Ct. 118, 54 L.Ed.2d 93 (1977), where we stated that a witness may testify to his or her plea agreement and the penalties faced if that plea agreement is breached. The prosecutor's later reference to the plea agreement during closing argument was merely a reiteration of the testimony that we have already held to be proper. The prosecutor neither insinuated that he possessed knowledge outside the record, nor injected his personal beliefs about Lucas' veracity. The prosecutor's comments were not improper. *Id.*

■ Lettieri also claims the prosecutor improperly asked him about the boiler room in the butcher shop where Lucas allegedly picked up Karachi heroin. The description and layout of the boiler room could cast doubt on Lucas' account of a drug transaction. During the government's cross examination of Lettieri, the prosecutor asked if Lettieri would mind leaving the witness stand to get a photograph of the room (apparently from the defense table). Lettieri, however, did not have a photograph. The defense objected,

and the colloquy was stricken from the jury's consideration.

■ The government may not suggest that information not in evidence supports its case. *United States v. Stillwell*, 900 F.2d 1104, 1112 (7th Cir.) *cert. denied*, 498 U.S. 838, 111 S.Ct. 111, 112 L.Ed.2d 81 (1990). The government has the burden of proving the defendant's guilt by introducing evidence to support its theory of the case. The defendant does not have to disprove his guilt by introducing evidence contrary to the government's theory at the government's behest. The government's cross examination tactic was improper. The exchange, however, did not result in reversible error. The defense objected contemporaneously, and the judge immediately instructed the jury to disregard the exchange. Lettieri had an opportunity to counter the improper statements with redirect examination and closing argument. The conduct was not so improper that the fairness of the trial was fundamentally flawed. Nor did the comment shift the burden of proof. *Cf. United States v. Dahdah*, 864 F.2d 55, 59 (7th Cir.1988), *cert denied*, 489 U.S. 1087, 109 S.Ct. 1550, 103 L.Ed.2d 853 (1989).

■ Apparently unwilling to say uncle, during closing argument the prosecutor again brought up the "boiler" testimony. He explained that the government did not have a search warrant for the butcher shop, but questioned why Lettieri did not produce a photograph of the boiler room to challenge Lucas' testimony about the drug deal. (Tr. 1687). The defense did not object, and we review for plain error. In light of the impropriety of this line of questioning during cross examination, we find this argument no more proper during the rebuttal. We interpret this revisit to the "boiler" testimony as an inartful attempt by the prosecutor to emphasize how the burden of proof had been fulfilled, allowing the jury to find Lettieri guilty beyond a reasonable doubt. Unfortunately the prosecutor chose to do this by inferring that items not in evidence supported his case. This violated the rule set forth in *Stillwell*, 900 F.2d at 1112. We consider again the

**1456**

*Pirovolos* elements, and determine that the error was not egregious and the weight of the evidence was against Lettieri. Balancing each of these factors, we hold that under a plain error analysis the comment was not so prejudicial as to render the trial fundamentally unfair.

▆▆▆▆ Lettieri's additional claims of government misconduct also concern the closing argument. During the argument, the prosecutor stated, "We know that Mr. Lettieri is probably the most desperate of all the defendants in this case. Why do I say that? I say that because of the defense he put on, the contrived defense." (Tr. 1685). The prosecutor should not inject personal opinion into the argument and should not speak as if he "knows" what the jury believes. *Auerbach*, 913 F.2d at 418 (citing *United States v. Young*, 470 U.S. 1, 17, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985)). But the defense did not object, and *Young* tells us that during closing arguments, plain error occurs only if the misconduct unfairly prejudiced the jury's deliberations. *Young*, 470 U.S. at 16–17 n. 14, 105 S.Ct. at 1047 n. 14. The prosecutor's comments were not so inflammatory as to render the trial fundamentally unfair, constituting plain error.[10]

▆▆▆ The final claim of prosecutorial misconduct challenges the prosecutor's statement to the jury asking them to "send a message" by convicting Lettieri. The defense objected immediately, and the district court sustained the objection, striking the argument from the record. (Tr. 1690). Lettieri argues that this statement invites the jury to act outside the law—inviting conviction for the purpose of sending a message rather than because the government has proven Lettieri guilty beyond a reasonable doubt. Defense counsel quickly objected. The district court sustained the objection and counseled the jury to disregard the statements. Also, the jury was properly instructed as to the burden of proof before being sent to deliberate. We presume juries follow such instructions.

*United States v. Bell*, 980 F.2d 1095, 1098 (7th Cir.1992). We do not find that the prosecutor's comments were so serious that they prejudiced Lettieri.

Lettieri claims that all these incidences of "misconduct" cumulatively affected the jury's verdict, denying his constitutional right to due process. We consider whether the outcome of the trial would be different in the absence of the prosecutor's misconduct. *Solles v. Israel*, 868 F.2d 242, 248 (7th Cir.), *cert. denied*, 490 U.S. 1101, 109 S.Ct. 2457, 104 L.Ed.2d 1011 (1989). The prosecution trod a fine line in its behavior at trial. We do not condone this behavior, but we do not believe that the prosecutor's actions were so egregious that the jury would have returned a different verdict absent such conduct.

### B. The recantation:

▆▆▆▆ Next, Lettieri argues that the district court abused its discretion when it denied his motion for a new trial based on Gomire's recantation. Recantations are viewed skeptically. *United States v. Kamel*, 965 F.2d 484, 494 n. 25 (7th Cir.1992); *United States v. Leibowitz*, 919 F.2d 482, 483 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1428, 113 L.Ed.2d 480 (1991). An affidavit recanting trial testimony is newly discovered evidence, and, if the circumstances are appropriate, may warrant a new trial. *Leibowitz*, 919 F.2d at 483. The standard under which newly discovered evidence requires a new trial is somewhat in dispute. We set forth a three-part test in *Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir.1928). Under *Larrison*, a new trial is necessary when 1) the court is satisfied that the testimony given by a material witness is false; 2) without the false testimony the jury might have reached a different conclusion; and 3) the party seeking the new trial was taken by surprise when the false testimony was given and could not address that falsity until after trial. The dispute arises in part three—how much surprise is required. *See*

---

**10.** Lettieri argues in his brief that the prosecutor said that the defense was the most contrived that the prosecutor had "ever seen". (Lettieri Brief at 38.) The transcript reveals no such statement by the prosecutor.

*Leibowitz,* 919 F.2d at 484–85; *cf. United States v. Mazzanti,* 925 F.2d 1026, 1029 (7th Cir.1991). We resolve this case on the first element, so we may leave the "surprise" dispute for another day.

In *Leibowitz,* the chief prosecution witness recanted his testimony after the trial in affidavits submitted to the district court. Following trial, the witness was jailed in the same facility as the defendant, Leibowitz. Leibowitz, a former attorney, prepared the affidavit that the witness signed. As in *Leibowitz,* Lettieri established a threatening presence at the jail where the recanting witness was incarcerated. Gomire was then contacted by Lettieri about changing his testimony. Gomire received economic favors from Lettieri, and Lettieri's attorneys drafted the affidavit which Gomire signed, without the aid of counsel. In both this case and *Leibowitz,* each witness was pressured by the defendant against whom he testified, and each signed affidavits drafted by those defendants or their representatives.

In both cases the judges held evidentiary hearings to consider the reliability of the recantation. In *Leibowitz,* the judge found the recantation suspect, despite the recanting witness' adherence to the recanted position. Here, an even greater reason exists to find the recantation suspect. Gomire disavowed the recantation. The judge had an opportunity to listen to Gomire's explanation and consider other testimony and evidence when finding that Gomire had testified truthfully at the trial. His determination of Gomire's credibility is a factual finding that we review under a clearly erroneous standard. *Smith v. BMI,* 957 F.2d 462, 463 (7th Cir.1992). The finding that Gomire lied in his affidavits is not clearly erroneous. The district court did not abuse its discretion in determining that no basis existed to grant Lettieri a new trial.

Lettieri argues that Gomire's testimony is inherently unreliable in light of his statements at trial, the recanting affidavits, and the subsequent recantation of the affidavits at the evidentiary hearing. Citing *Mesarosh v. United States,* 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956), the defense claims that Gomire must be completely discredited due to his conflicting stories, and therefore Lettieri must be retried. We do not agree.

*Mesarosh* involved a government informant who testified against various individuals, asserting that they were members of the Communist Party. The informant testified in several different proceedings and acknowledged that he lied under oath on at least one occasion at the instruction of government officials. The officials denied the allegations. The informant also testified to bizarre allegations of assassination plots against senators, congressmen, and other government officials. The Solicitor General stated during motions proceedings before the Court that the informant's testimony was unreliable. The question then presented to the Court was whether the waters of justice had been so poisoned that the integrity of the United States Government called for a new trial to "cleanse the reservoir" of all impurities. The Court ordered a new trial to preserve the untainted administration of justice.

*Mesarosh* is clearly distinguishable. In that case, the witness lied under oath on several occasions, testifying to bizarre scenarios with no apparent basis in fact. In addition, the government attorney, who presumably knew the witness and the information to which he was testifying, urged the Court to discredit the testimony. Here, the district court found that Gomire did not lie under oath, but rather, he lied in his affidavit. In addition, the circumstances surrounding the affidavit lend support to Gomire's account of the reasons why he recanted his trial testimony. Although Gomire is by no means the perfect witness, his testimony was not so incredible that *Mesarosh* requires him to be discredited.

Lettieri's additional claim that Gomire's testimony at trial and at the hearing were inconsistent is not enough to warrant a new trial under *Mesarosh.* The statements are not clearly inconsistent, and to invoke the public policy protection against the tainted administration of justice, Lettieri

needs to show more than perceived inaccuracy in the testimony.

### C. Abuse of the Grand Jury process:

Lettieri also claims that the trial court improperly allowed the government to introduce evidence that was obtained through an abuse of the grand jury process. The government may not use the grand jury for the sole or primary purpose of obtaining evidence against a defendant who has been indicted. *United States v. Thompson*, 944 F.2d 1331 (7th Cir.1991), cert. denied, — U.S. ——, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992). Lettieri argues that one of the witnesses who testified against him at trial was interviewed as a result of an ongoing grand jury investigation after the grand jury had already indicted him for the crime for which the government was seeking information. The evidence in question was testimony by a witness who worked for a securities investment firm where Lettieri had an account. The witness testified that in the fall of 1988–the relevant time frame encompassed by the conspiracy—Lettieri attempted to deposit $50,000 cash into his investment account. (Tr. 480). She testified that when Lettieri came to the office to make the deposit, he was carrying an attaché case filled with bundles of cash. The money was not new currency wrapped in money bands, but rather, it was old and bundled in rubber bands. (Tr. 483).

Lettieri claims that throughout the case he sought access to the grand jury minutes so he could ascertain whether the grand jury was used to acquire this witness' testimony. The district court denied the motion, (R. 351), but did review the grand jury materials *in camera.*[11] (R. 349). The government counters by stating that a superseding indictment was filed against Lettieri. The government argues that the grand jury investigation continued in an effort to gather additional evidence linking Lettieri to the charges brought in the superseding indictment, and that the witness

was interviewed during that ongoing investigation.

Lettieri bears the burden of establishing that the grand jury process was abused. *Thompson*, 944 F.2d at 1337. He does not, however, offer any evidence to dispel the government's argument that the information garnered from the witness was used to bring the charges in the superseding indictment. We have no reason to believe that the sole and dominant purpose of the continuing investigation was to assemble information regarding charges brought in the first indictment rather than marshalling evidence for the charges brought in the superseding indictment.

### D. Ineffective assistance of counsel:

Lettieri's final challenge to his conviction is that he was denied effective assistance of counsel in violation of the Sixth Amendment. This court prefers not to consider ineffective assistance of trial counsel claims raised for the first time on appeal. If, however, the record is sufficiently developed, we will consider the defendant's claim. *United States v. Booker*, 981 F.2d 289, 292 (7th Cir.1992). Lettieri claims his counsel was ineffective because neither of his attorneys objected to the various "inflammatory" and "hearsay" statements that were elicited at trial. This is the type of ineffective assistance of counsel claim that can be considered based on the trial record, and we therefore examine Lettieri's claim.

Ineffective assistance of counsel claims are reviewed under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Booker*, at 292. The defendant must show that the attorney's performance was deficient to the degree that the attorney was not functioning as "counsel" contemplated by the Sixth Amendment. The deficiency is judged by whether the attorney acted with reasonable professional

---

**11.** Lettieri argues that "the Court [*sic*] should not have allowed [the witness'] testimony without at least inspecting the grand jury transcripts and minutes to determine whether there had

been an abuse of process." (Lettieri Brief at 44). Our review of the record indicates the district court did just that.

judgment falling within the wide range of professionally competent assistance. The attorney is strongly presumed to have rendered effective assistance. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Second, the defendant must show that actual prejudice occurred as a result of the attorney's deficient performance. Actual prejudice occurs when a reasonable probability exists that but for the attorney's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068.

Lettieri was represented by two attorneys. He argues that his attorneys adopted a policy of not objecting to any evidence, even if it was inflammatory or irrelevant. This policy, he claims, rendered his attorneys' performance unprofessional and outside the wide range of professionally competent assistance. Specifically, Lettieri cites his attorneys' failure to object when Lettieri was being cross examined by the prosecutor about whether he had previously pleaded guilty to a misdemeanor crime. Also, Lettieri points out his attorneys' failure to object to several other statements that allegedly were inadmissible hearsay. He claims prejudice from this inaction and argues that without these errors, the jury would have a reasonable doubt as to Lettieri's guilt.

We find Lettieri's argument unavailing. We note that as a general proposition, Lettieri deemed his attorneys "very competent." (Lettieri Brief at 44). Next, our review of the record shows many motions in limine filed on Lettieri's behalf, as well as many objections made throughout the trial. *See, e.g.,* Tr. at 124, 477, 481, 495. What is more, Lettieri acknowledges that his attorneys objected during the trial. Lettieri's "policy of no objection" argument fails.

*E. The sentence:*

Lettieri alleges his sentence is based upon an improper and unreliable proffer by an indicted co-conspirator. When sentencing Lettieri under the United States Sentencing Guidelines, the district court calculated Lettieri's total offense lev-

el at 38. The level was based on Lettieri supplying 36 kilos to the conspiracy, and that amount was based in part on Miller's proffer to the government when he pleaded guilty. Lettieri asserts that the proffer completely conflicts with the evidence at trial, and therefore is inherently unreliable. In addition, he claims a Sixth Amendment violation of his right to cross examine the witness, because Miller neither testified at trial or at the sentencing hearing. The amount of drugs upon which a sentence is based is a factual determination based upon a preponderance of the evidence, and we review this decision under a clearly erroneous standard. *United States v. Cea,* 963 F.2d 1027 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 281, 121 L.Ed.2d 208 (1992).

Hearsay is an integral part of the sentencing process, and the Miller proffer may be considered for sentencing purposes. *United States v. Escobar–Mejia,* 915 F.2d 1152, 1154 (7th Cir.1990). Although Lettieri claims that the Miller proffer conflicts with the trial testimony, our review of the transcripts reveals no conflicts. We do not have a definite and firm conviction that factual error has been committed, therefore the district court quantity finding is not clearly erroneous. *United States v. Herrera,* 878 F.2d 997, 1000 (7th Cir.1989).

Lettieri's constitutional claim fairs no better. A convicted defendant does not possess a constitutional right to cross examine a person who provided the government with information that was later used during sentencing. *Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949); *Escobar–Mejia,* 915 F.2d at 1154. Because Lettieri has no right to cross examine Miller, and because we hold that the district court decision is not clearly erroneous, Lettieri's challenge to his sentence fails.

### III.

The defendants' convictions are AF-FIRMED in all respects, Lettieri's sentence is

AFFIRMED, and the decision denying Lettieri's motion for a new trial is AFFIRMED.