**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Anthony FORT, Defendant–Appellant.**

No. 92–2703.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 28, 1993.

Decided July 30, 1993.

Barry R. Elden, Asst. U.S. Atty. Criminal Receiving, Appellate Div., Robert Christopher Cook (argued), Chicago, IL, for plaintiff-appellee.

Gerald J. Collins, John A. Meyer (argued), Chicago, IL, for defendant-appellant.

Before RIPPLE and KANNE, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

RIPPLE, Circuit Judge.

A jury convicted Anthony Fort of one count of possession with the intent to distribute cocaine and one count of conspiring to commit the same crime. *See* 21 U.S.C. §§ 841 and 846 (1988). He now appeals the conspiracy conviction on the ground that although he made a single cocaine purchase, he was not involved in a conspiracy. Additionally, Mr. Fort challenges the district court's refusal to give the jury a buyer-seller instruction. For the reasons that follow, we affirm the decision of the district court.

## I

## BACKGROUND

On March 11, 1990, agents from the Federal Bureau of Investigation (FBI) obtained authorization to intercept telephone conversations over two telephone lines because probable cause existed to believe that the telephones were being used for narcotics trafficking. Both lines were listed in the name of Forbes & Barner Insurance and were located in the residence of Valerie Mays. The federal agents maintained the wiretap from March 13 through April 11, 1990. On April 2, Mays telephoned Shirley Crowder. During the course of this conversation, Mays indicated that she had heard that Crowder's nephew was trying to get in touch with her. The following week, on April 9, Mays received a telephone call from Crowder's nephew, Anthony Fort. Mr. Fort told her that he needed to speak with her. Mays responded that he should speak with her in person instead of over the telephone. Accordingly, Mr. Fort went to Mays' apartment later that morning.

Shortly after Mr. Fort arrived, Mays telephoned Gregory Mitchell and, using what she later described as "code words," told him that she had a friend who was interested in purchasing one-half kilogram of cocaine. Mitchell told her that he could complete the transaction for $16,000. Mays relayed this message to Mr. Fort, who then left her apartment. Later that afternoon, Mr. Fort returned to Mays' apartment with $15,400 in cash. Mays telephoned Mitchell again and told him that her friend only had $15,000. Mays also indicated that the transaction was a favor to Mr. Fort's father, who was the head of a criminal organization of which she and Mr. Fort were both members. Additionally, Mays indicated to Mitchell that this purchaser would be making larger purchases in the future and thus should receive a better deal than what had been offered. *See* Government's Ex. 7, Transcript of Apr. 9, 1990 Telephone Conversation between Mays and Mitchell, at 2. After some negotiation, Mays and Mitchell settled upon a new price of $15,500. Shortly thereafter, Mays and Mr. Fort took a taxicab to 10516 Eggleston, an address that Mitchell had given to Mays. Mr. Fort waited in the taxicab, while Mays went inside to make the cocaine purchase. Mays and Mitchell completed the transaction and Mays returned to the taxicab. Mays and Mr. Fort then returned to Mays' apartment. Once back at her apartment, according to Mays' testimony, Mays tested a sample of the cocaine, while Mr. Fort placed a telephone call. Approximately ten minutes after Mays and Mr. Fort had returned to her apartment, FBI agents raided the apartment.

On October 2, 1991, a grand jury returned a ten-count indictment charging Anthony Fort, Valerie Mays, Gregory Mitchell and Linda Mitchell with various counts of possession with the intent to distribute cocaine and conspiracy to commit the same crime. Mr. Fort was named in two counts. Count X charged Mr. Fort with possession with the intent to distribute approximately one-half kilogram of cocaine, and Count I charged him with conspiracy to commit that crime. Mr. Fort pled not guilty to both charges and his case was tried to a jury.

Mays entered into a plea agreement with the government and received a reduced sentence of two and one-half years' imprisonment.[1] In exchange for her sentence reduction, Mays agreed to testify against her co-defendants. Mays was the government's key witness at Mr. Fort's trial and testified that she had made the April 9 purchase of one-half kilogram of cocaine for Mr. Fort. Additionally, Mays testified that Mr. Fort had told her that he wanted to make future purchases on a weekly basis in increasing quantities. Specifically, Mays testified that Mr. Fort indicated that, in the upcoming weeks, he would be purchasing one-half kilogram, two kilograms, five kilograms, and finally seven kilograms of cocaine. According to Mays' trial testimony, she was not paid for her services in the April 9 transaction. Rather, Mr. Fort told her that his father would take care of her at a later time. Mays testified that she had known Mr. Fort "all his life" and that his father was a long-time family friend. At trial, Mays described herself as a drug broker or middleman and testified that she had been performing such brokering services for family members and friends since 1984. She consistently maintained that she had not purchased any drugs from Mitchell on April 9, rather, that she had merely arranged a purchase of drugs for Mr. Fort.

Mays' niece, Andrea Johnson, next testified for the government. On April 9, 1990, Johnson was living in the same apartment as Mays. Johnson testified that on the afternoon of April 9, she had been in the apartment and had seen Mays and Mr. Fort enter the apartment and go into Johnson's bedroom. According to Johnson, she followed them into her bedroom to see what they were doing. Johnson testified that she observed Mays "tooting" cocaine and that she observed Mr. Fort sitting on the bed with a bag in his hand. She further testified that within minutes of these observations, the FBI raided the apartment.

The government also called one detective from the Chicago Police Department and two FBI agents to the stand to testify. Detective Fred Wheat testified that on April 9, 1990, he had been working surveillance outside of Mays' apartment and that he had observed Mays and Mr. Fort leave Mays' apartment together in a taxicab. Detective Wheat further testified that he followed the taxicab to 10516 Eggleston and observed Mays get out of the taxicab and go into a residence. According to the detective, Mr. Fort remained in the taxicab and Mays, carrying a brown bag, returned ten to twelve minutes later. The detective then followed the taxicab back to Mays' apartment and observed both Mays and Mr. Fort enter Mays' apartment.

Special FBI Agent John Larsen next took the witness stand. Agent Larsen testified that on April 9, 1990, he participated in the FBI raid on Mays' residence. According to Larsen's testimony, there were approximately twelve adults and numerous children in the apartment when the FBI entered. He further testified that the agents had a narcotics canine with them and that the dog located cocaine in the refrigerator and in two separate bedrooms. In one of the bedrooms the agents retrieved approximately one-half kilogram of cocaine packaged in two plastic bags. No fingerprints were recovered from either bag. Finally, FBI Agent Grant Ashley testified that he also had participated in the April 9 raid on Mays' residence. Agent Ashley testified that he asked Mr. Fort a series of questions during the raid. According to Agent Ashley, Mr. Fort initially told the agent that his name was Tom Jones and that he worked at a restaurant. The parties later stipulated that no restaurant existed at the address that Mr. Fort had given the agent. All three law enforcement officials identified Mr. Fort at trial.

The government introduced into evidence sixteen tape-recorded telephone conversations that were intercepted as a result of the wiretap on Mays' two telephone lines. These tapes included three conversations between Mays and Shirley Crowder, four conversations between Mays and Mr. Fort, and six conversations between Mays and Mitchell.

---

1. Gregory Mitchell also pled guilty. His wife, Linda Mitchell, was tried as an accomplice and found guilty.

All sixteen tapes were played for the jury during trial. Additionally, each juror was provided with a transcript of the tapes to follow along with while the tapes were played.

At the jury instruction conference, Mr. Fort requested the following buyer-seller instruction:

> If a crime is so defined that an agreement is required to commit it, that minimum agreement, without more, cannot also be punished as a conspiracy.
>
> As I have already instructed you, the defendants are charged with conspiring to knowingly and intentionally possess cocaine with the intent to distribute it. 21 U.S.C. Sec. 841 makes it a crime to, among other things, distribute cocaine, and distribution, by definition, requires two persons and an agreement between them to accomplish the act. However, that agreement by itself cannot be the agreement which you must find in order to sustain the charge of conspiracy in this case.

R.102, Defendant's Proposed Jury Instruction 1. The government objected to the instruction on the grounds that Mays had negotiated the cocaine deal for Mr. Fort and there was no evidence indicating that Mr. Fort had merely purchased the cocaine directly from Mays. The government argued that a buyer-seller instruction was not supported by either the evidence adduced or the arguments presented at trial. In response, Mr. Fort argued that there is virtually always a middleman in drug deals and that under the government's theory a buyer-seller instruction would rarely ever be appropriate. Ultimately, the district court refused to give the instruction. The jury convicted Mr. Fort on both counts, and the court sentenced him to seventy months' imprisonment on each count, with the sentences to run concurrently. Mr. Fort now appeals his conviction.

## II

## ANALYSIS

■ On appeal Mr. Fort raises two arguments. First, submits Mr. Fort, he' was not involved in any .conspiracy. Rather, he took part in a one-time drug transaction. Mr. Fort does not challenge his conviction on the substantive offense of possession of cocaine with . the intent to distribute. Second, Mr. Fort argues that the district court erred by failing to give the jury the buyer-seller instruction that he had tendered. We address these arguments in turn.[2]

### A. *Sufficiency of the Evidence*

■ Mr. Fort argues that the government failed to establish by substantial evidence that he knew of the existence and the scope of a conspiracy and sought to promote its success. Instead, he contends he was a one-time buyer. In contrast, the government argues that substantial evidence was produced at trial to show that Mr. Fort conspired with Mays to buy cocaine from Mitchell. According to the government's theory, Mays did not merely sell cocaine to Fort. Rather, she assisted Fort in obtaining cocaine from Mitchell.

■ "A conspiracy exists when two or more individuals agree to join together to commit an illegal ·act. 'The crime of conspiracy focuses on agreements, not groups.' " *United States, v. Smith,* 995 F.2d 662, 666 (7th Cir.1993) (quoting *United States v. Townsend,* 924 F.2d 1385, 1389 (7th Cir. 1991)). In reviewing a conspiracy conviction, we view the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government. *United States v. Goines,* 988 F.2d 750, 758 (7th Cir.1993). The conviction will be upheld if any rational jury could have found the defendant guilty beyond a reasonable doubt. *Id.* (citing *United States v. Curry,* 977 F.2d 1042,. 1053 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1357,

---

**2.** The government notes that Mr. Fort challenges only one of two sentences of identical length that run concurrently. However, the fact that the defendant is serving a concurrent sentence, without more, does not make an error in sentencing harmless. *See United States v. Aquilla,* 976 F.2d

1044, 1049 (7th Cir.1992) (rejecting government's argument that, when defendant received equal and concurrent sentences for drug trafficking and conspiracy to ,commit the same crime, any error on the conspiracy conviction would be harmless).

122 L.Ed.2d 737 (1993)). "[W]hen the sufficiency of the evidence to connect a particular defendant to a conspiracy is challenged on appeal, we must find substantial evidence in the record of the defendant's participation in the conspiracy." *United States v. Auerback,* 913 F.2d 407, 414 (7th Cir.1990) (quoting *United States v. Durrive,* 902 F.2d 1221, 1228 (7th Cir.1990)). "[S]ubstantial evidence is merely evidence of sufficient quantity and quality to support the jury's verdict." *Auerback,* 913 F.2d at 414 n. 6. Moreover, a conspiracy conviction may be based solely on circumstantial evidence. *Curry,* 977 F.2d at 1053.

■ In sum, to prove that Mr. Fort was involved in a conspiracy, the government must show both that he knew of the conspiracy and that he intended to join its criminal purpose. *United States v. Badger,* 983 F.2d 1443, 1449 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993) (No. 92–8252), *and petition for cert. filed* (U.S. May 27, 1993) (No. 92–1910). In *Badger,* we rejected an argument similar to Mr. Fort's. *Badger* involved four defendants and a single one-half kilogram drug brokering transaction. *Id.* Each defendant in *Badger* made the argument that the evidence only established a series of buy-sell agreements. That is, according to the defense, the evidence did not show that any of the defendants had any interest or knowledge in what would happen to the drugs after leaving his hands. In *Badger,* we concluded that the jury, presented with a series of tape-recorded telephone conversations and lengthy trial testimony, could reasonably conclude that each defendant knew that, either before or after his contact with the drugs, the drugs were going to be purchased from or sold to a third party. We further concluded that this evidence was sufficient to sustain the conspiracy convictions. *Id.* at 1449.

In the present case, taking all reasonable inferences in the light most favorable to the government, a reasonable jury could find that Mr. Fort conspired with Mays. Mays testified that Mr. Fort told her that he hoped to make additional cocaine purchases from her in the future and that she was to be compensated later by Mr. Fort's father. Mays further testified that she, Mr. Fort, Mr. Fort's father, and Crowder were all part of an organization that Mr. Fort's father headed and that the same organization used certain code words to conduct drug transactions among its members. Mr. Fort claims that he was merely "puffing" when he mentioned the possibility of future drug transactions. He further contends that the fact that he was unable to obtain even the full $16,000 initially requested by Mitchell evidenced that he would not be able to secure the funds necessary for future deals of the quantities that he suggested to Mays.

The jury was entitled to evaluate the testimony and make a credibility determination as to whether there was sufficient evidence to establish an ongoing relationship between Mays and Mr. Fort.[3] A rational jury could have determined that Mr. Fort intended to continue a brokering relationship with Mays in the future and that by representing such intentions to Mays, Mr. Fort was able to convince her to provide her services in exchange for a promise of future compensation from his father. A reasonable jury could also have concluded that Mr. Fort knew that a conspiracy existed within the organization to which he, Mays, Crowder, and his father belonged, and that, by approaching Mays to inquire about a drug purchase, he intended to join that conspiracy's criminal purpose. Further, Mays' niece, Johnson, and three law enforcement officials all testified that Mr. Fort was with Mays on April 9, 1990, when she purchased a substantial quantity of cocaine. Accordingly, a reasonable jury could find that Mr. Fort had conspired with Mays to make at least one cocaine purchase from a third party, Mitchell. *See United States v. Manzella,* 791 F.2d 1263, 1265 (7th Cir.1986) (describing drug middleman as "as much a part of the conspiracy as a real estate broker is a part of the deal to sell a house").

Mr. Fort argues that the fact that he purchased a large quantity of drugs, without

---

**3.** In *United States v. Lechuga,* 994 F.2d 346 (7th Cir.1993) (en banc), this court held that, in a drug transaction accomplished with the use of a middleman, the evidence was sufficient to establish a conspiracy between the ultimate buyer and the middleman who purchased from the dealer.

more, is insufficient to impute membership in the conspiracy to him. However, the government did not rely solely upon the quantity of drugs purchased to show a conspiracy. Viewing the evidence in the light most favorable to the government, Mr. Fort entered into an agreement with Mays to attempt to purchase cocaine from Mitchell on April 9. We cannot accept Mr. Fort's contention that, because he had never met Mitchell and because there is virtually always a middleman involved in drug purchases, a conspiracy cannot be based upon a relationship between Mr. Fort and Mays. "The government need only prove that the defendant knew of the agreement and intended to join it; the government need not prove specifically with whom the defendant conspired or that he even knew the other conspirators." *Smith*, 995 F.2d at 666. Moreover, as we have already noted, Mr. Fort and Mays discussed the possibility that Mr. Fort would continue to make weekly purchases in increasing quantities after the April 9 purchase. Accordingly, we cannot agree that a rational jury could not have concluded that the government had produced substantial evidence that Mr. Fort had conspired with at least Mays, if not the larger criminal organization to which he and Mays both belonged, to purchase cocaine from Gregory Mitchell.

Finally, while we have relied primarily on the evidence of the conspiratorial relationship between Mr. Fort and Mays, we do not wish our opinion to be interpreted as holding that the government presented insufficient evidence that the conspiracy also extended to Mitchell. While the evidence admittedly is not as strong as it is with respect to the conspiratorial relationship between Mr. Fort and Mays, as we have noted earlier, there was evidence that Mitchell was aware that the purchase involved was contemplated to be the first of many.

## B. *Jury Instructions*

■ Mr. Fort next argues that the district court committed reversible error by refusing Mr. Fort's tendered jury instruction that a mere buyer-seller relationship cannot be the basis for a conspiracy conviction. In response, the government contends that a buy-

er-seller instruction would have been inconsistent with Mr. Fort's trial defense, and consequently, would have been inappropriate. We agree.

A defendant is only entitled to a buyer-seller instruction if it is supported by the evidence produced at trial. *United States v. Canino*, 949 F.2d 928, 941 (7th Cir.1991) (defendant's failure to assert buyer-seller defense at trial justified district court refusal to give requested instruction on that defense because defendants were in no way prejudiced by that decision), *cert. denied*, — U.S. ——, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992); *see also United States v. Townsend*, 924 F.2d 1385 (7th Cir.1991) (defendant is not entitled to a buyer-seller instruction if such a defense theory has no support in the record) (citing *United States v. Douglas*, 818 F.2d 1317, 1322 (7th Cir.1987)). As we elaborated in *Douglas*:

> Each drug conspiracy case must be analyzed according to its specific facts to determine whether a buyer-seller instruction is appropriate. A defendant is entitled to a buyer-seller instruction only if the instruction has some foundation in the evidence. In deciding whether an instruction is supported by the evidence in a particular case, a court may choose to consider such factors as the quantity of drugs involved, their resale value, whether the defendant is an addict, and whether the purchases, during the relevant time period at issue, were of the quantity and quality that a jury could reasonably believe are generally used for personal consumption. *See United States v. Franklin*, 728 F.2d 994, 998–1000 (8th Cir.1984) (collecting cases).

818 F.2d at 1321. We believe the district court acted correctly when it declined to give the instruction based on this record. The evidence before the jury raised the issue of whether there was a conspiracy to possess drugs with the intent to distribute. Mr. Fort chose to portray himself as a mere bystander, rather than as a simple buyer who was not involved in the conspiracy. Thus, a buyer-seller instruction would have been inconsistent with the defense position that Mr. Fort was not a buyer at all. Accordingly, we cannot agree that the district court erred in

refusing to give Mr. Fort's tendered jury instruction.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.