48 F.3d 1452
 41 Fed. R. Evid. Serv. 892
 UNITED STATES of America, Plaintiff-Appellee,
v.
Victor PLESCIA, Frank Bonavolante, Camillio Grossi a/k/a
Canillo Grossi a/k/a Camillo Grossi a/k/a Gam,
Anthony Grossi, and Norman Demma,
Defendants-Appellants.
 Nos. 92-1222, 92-1223, 92-1224, 92-1225, 92-1226 and 93-3405.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 3, 1994.
Decided March 8, 1995.
Rehearing and Suggestion for Rehearing En Banc Denied April
19, 1995.
 
 Barry Rand Elden, Asst. U.S. Atty., Bennett E. Kaplan (argued), Office of U.S. Atty., Criminal Receiving, Appellate Div., Helen B. Greenwald, Asst. U.S. Atty., Criminal Div., Jack O'Malley, Office of State's Atty. of Cook County, Chicago, IL, for U.S.
 Michael B. Mann (argued), Zavislak & Mann, Oakbrook, IL, for defendant-appellant Victor Plescia.
 James R. Meltreger, Peter A. Regulski (argued), Anthony J. Onesto, Onesto, Giglio, Meltreger & Associates, Chicago, IL, for defendant-appellant Frank Bonavolante.
 Alexander M. Salerno, Berwyn, IL, argued, for defendant-appellant Camillio Grossi.
 Cheryl I. Niro, Oak Park, IL, argued, for defendant-appellant Anthony Grossi.
 Robert A. Korenkiewicz, Chicago, IL, argued, for defendant-appellant Norman Demma.
 Before POSNER, Chief Judge, CUMMINGS and ENGEL,* Circuit Judges.
 ENGEL, Circuit Judge.
 
 
 1
 The five defendants in this case appeal the convictions and sentences arising out of a sizeable Chicago-based cocaine conspiracy spanning several years. Because we feel that the vast weight of the evidence supports the convictions and the sentences and that any possible error was harmless, we affirm.
 
 
 2
 Victor Plescia headed the conspiracy, which began during or before 1986. He sent couriers, including chief prosecution witness Nickalos Rizzato and defendant Anthony Grossi, and he went himself many times to Miami, where he had a cocaine supplier. Rizzato made at least ten trips over several years to pick up over 50 kilograms of cocaine, and as many trips carrying cash to pay the Miami supplier. In 1988, with an initial investment of $40,000, Frank Bonavolante began to finance cocaine purchases in return for a share of the resale profits. After Plescia or a courier brought the cocaine to Chicago, Camillio Grossi and his son, Anthony Grossi, or others distributed it in street-use quantities. When Bonavolante or Plescia wanted cocaine for their own use, Plescia got it from one of the Grossis. Plescia also set up deals between the Grossis and others, including Norman Demma, who regularly bought quantities of cocaine for redistribution, sometimes on credit.
 
 
 3
 Federal officials began to investigate the drug ring in 1989. With the aid of a confidential informant, the officers identified Plescia as the leader of the conspiracy. An undercover agent met with Plescia to arrange a drug purchase, and Plescia told the agent a considerable amount of detail about the operation. With the accumulating evidence against Plescia, federal agents applied for and received permission for Title III electronic surveillance of Plescia's mobile phone and pager. Surveillance agents recorded many conversations between the defendants in which Plescia coordinated the activity of the conspiracy. The wiretap in place, officers stopped a coconspirator named Kevin Geiger after he met with Plescia. The police then recorded the activity as Plescia called and paged the other four defendants, warning them that Geiger had been stopped with narcotics and telling them to lay low for a while. Plescia did not then reach Demma, despite calling his residence numerous times. In paging Bonavolante, Plescia used the code number 8, which Rizzato testified indicated drug-related activity.
 
 
 4
 Once the conspiracy resumed normal operations, the federal agents recorded a series of phone conversations in which Demma told Plescia he wanted to purchase more cocaine, Plescia called Anthony Grossi to check availability, then Plescia called back Demma at his residence and set up the drug transaction. The transaction, observed by federal agents, occurred in a parking lot where Plescia and Demma parked before entering a cafe. Afterward, federal agents pursued and caught Demma, who had thrown the cocaine out of his car during the chase. Then they let him go and monitored the burst of communications among the defendants. Demma immediately called Plescia to warn him that the agents followed them and may have bugged Plescia's phone or pager. Plescia again called Bonavolante and the Grossis to warn them of the attention from drug enforcement officers, and Plescia agreed to replace Demma's lost cocaine. When the U.S. had established the roles and identities of the people involved in the conspiracy and had sufficient evidence against them, all five were arrested, indicted, and tried.
 
 
 5
 The five defendants were tried in one proceeding with two juries, one for Plescia, Anthony Grossi, and Demma and one for Bonavolante and Camillio Grossi. Each defendant had separate counsel. The juries returned verdicts of guilty against all defendants, on most counts. All five were convicted of conspiring to traffic in narcotics and of various counts of using a telephone or pager to facilitate their drug business. All of the defendants now appeal, claiming that numerous reversible errors occurred.
 
 
 6
 We have considered all the arguments offered by the defendants, and we find sufficient merit for discussion in only a few. We will briefly mention and dismiss some other claims in Section IV of this opinion.
 
 I. The Gambling Tapes
 
 7
 Bonavolante and Camillio Grossi argue that the trial judge committed reversible error in denying them access to and use of certain evidence which they believe to be exculpatory. During and preceding the drug conspiracy, Bonavolante directed an illegal gambling conspiracy in which Camillio Grossi and Plescia were involved. Federal agents separately investigated the gambling conspiracy, again using Title III electronic surveillance, and recorded twelve conversations between Bonavolante and others not involved in the drug ring. One of the tapes mentioned Camillio Grossi's role in the gambling operation. Bonavolante and Grossi defended in the drug prosecution by claiming that their activities, while illegal and conspiratorial, were limited to gambling, not drugs. They wished to offer the twelve tapes of gambling conversations as evidence to counter the government's tapes in which the defendants allegedly held drug-related conversations; in both sets of conversations, the speakers primarily used general language such as "thing," "the stuff," "that guy," and "anything" as well as a euphemism about "groceries" and "a quarter of salami." However, the gambling investigation had not been completed at the time of this trial, and disclosure of the tapes would have jeopardized the separate investigation and prosecution. The trial judge ruled that the U.S. need not disclose the tapes to the defendants. The U.S. disclosed the tapes to the defendants on appeal, after disclosure posed no danger to the other investigation.
 
 
 8
 Bonavolante and Camillio Grossi claim that the tapes tended to exculpate them, and that therefore they had a right to them under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). They cite as support for their claim a Ninth Circuit case, United States v. Abascal, 564 F.2d 821 (9th Cir.1977). The government in that case argued that real estate language used in a taped conversation referred to LSD, and the defendant wanted to present other taped conversations using similar language which actually concerned real estate deals. The Abascal court held that suppression of the defense's tapes represented prejudicial error as to the charges of use of a telephone to further illegal activity. 564 F.2d at 830. That case is easily distinguishable, however, because the district court in Abascal had improperly suppressed the evidence as hearsay (564 F.2d at 830), whereas here, the court balanced the defendants' interests against the government's very real interest in keeping the tapes confidential. Thus, Bonavolante and Grossi must make a stronger case than did the defendant in Abascal to justify reversal of the ruling.
 
 
 9
 We review the district court's ruling, made after an in camera review of the material, for an abuse of discretion. "When a criminal defendant seeks access to confidential informant files, we rely particularly heavily on the sound discretion of the trial judge to protect the rights of the accused as well as the government." United States v. Phillips, 854 F.2d 273, 277 (7th Cir.1988). To win a new trial, defendants must prove that there is a reasonable probability that disclosure of the evidence would have changed the outcome of the trial. United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). Such a reasonable probability exists if the evidence undermines confidence in the outcome. Phillips, 854 F.2d at 277.
 
 
 10
 The defendants characterize the suppressed tapes as groundbreaking, likely to have convinced the jury that Grossi and Bonavolante limited their criminal activity to gambling and that they were simply swept up with the others, admittedly their friends and associates, who were the real cocaine conspirators. Yet the defendants did receive, and did admit into evidence several tapes made during the drug investigation of conversations limited to gambling. Bonavolante and Grossi fail to explain how the suppressed tapes differed significantly from these, or how the suppressed tapes could have augmented the admitted tapes except by volume. Thus the defendants were able to present their gambling defense without the suppressed tapes. The government admitted that both had been involved in a gambling conspiracy, and it admitted freely that several of the tapes from the drug investigation exclusively concerned gambling. The defendants presented their gambling defense using these and the "substitution theory" described below, and the jury rejected it. Moreover, the suppressed tapes were too obscure and confusing to be effectual. Almost all of the so-called "code" words used in the suppressed tapes are generalities, and the taped conversations are vague and rambling in the extreme. Bonavolante and Grossi would have had to stage a miniature gambling trial simply to explain the suppressed tapes. We find it difficult to see how the tapes could have improved the defendants' case perceptibly, much less how they might have changed the outcome in the face of the government's evidence.
 
 
 11
 Further, even if the defendants had not had similar evidence to present, we do not believe that the gambling tapes are effectively exculpatory. Despite the defendants' characterizations, the drug tapes primarily involve not code words, which require a prior agreement to acquire their secret meaning, but non-specific words like "thing," "anything," "stuff," "friend," and "guy." These words were given meaning by the speakers' conspiracy, as the government demonstrated by their actions before and after the calls. As such, their meaning cannot be refuted by a demonstration that at another time, the words had been used to mean something else; that is the very nature of such generalities, that they mean different things at different times. If someone says "that thing" and points at something, then the act of pointing provides a context for the generic word, which then means the object pointed at--until someone points at something else.
 
 
 12
 When "code" words rather than generalities appeared on the government's tapes, the government did not claim to have broken the code; rather, it demonstrated by the defendants' observed actions before and immediately after the calls that the "code" words must have referred to drugs. The probative value of the government's tapes lay not in the actual words, but in the way the conversations interacted with drug activity observed by the agents. For example, the U.S. introduced a taped conversation in which Demma spoke with Plescia and asked for "a quarter." As defense counsel points out, "a quarter" could refer to gambling paraphernalia or orders. In this case, however, Plescia told Demma he would make some inquiries, hung up, immediately called Camillio Grossi and asked for "a quarter of salami." Grossi replied, "Groceries like last time." Later that afternoon, Grossi delivered 125 grams of cocaine to Plescia, who delivered it in turn to Demma. These actions strongly indicate that the three defendants had just set up a drug transaction, and that "a quarter of salami" meant a quantity of cocaine. Tapes on which Bonavolante and gambling conspirators used the word "groceries" in other contexts, even about Grossi, would not undermine a jury's conclusion that in the Demma-Plescia-Grossi conversations, the defendants were talking about drugs, particularly because the suppressed conversations were all held with other people, several months before the taped drug conversations. Sometimes the word "groceries" means food, even to a drug conspirator.
 
 
 13
 The other tapes do not offer another context for the drug conversations, but are distinguishable precisely because they are set in another context. Even if the tapes were exculpatory, they would not suffice to undermine our confidence in the verdict. The trial judge had discretion to admit or suppress the gambling tapes, and we hold that he did not abuse that discretion.
 
 II. Sentencing
 
 14
 All five defendants challenge their sentences. All except Camillio Grossi were sentenced according to U.S. Sentencing Guideline Sec. 2D1.1, which holds a drug conspirator accountable in sentencing "for all drug transactions that he was aware of or that he should have reasonably foreseen." United States v. Edwards, 945 F.2d 1387, 1394 (7th Cir.1991). The defendants claim that the trial judge attributed excessive quantities of cocaine to the conspiracy and to each conspirator. This court will not reverse a sentence unless it is based on a clearly erroneous drug volume. United States v. Mojica, 984 F.2d 1426, 1443 (7th Cir.1993).
 
 
 15
 Rizzato, the chief prosecution witness and one of the drug couriers, provided most of the information regarding the quantity of cocaine handled by the drug ring. He testified that he made at least ten trips to Florida to pick up cocaine, and that while most trips he carried 5 kilograms, on one occasion he picked up 10 kilograms. He also testified that he was not the only courier, that Anthony Grossi made at least one trip to pick up cocaine, and that another courier made several trips. He also testified that Plescia often went to Florida to pay for or pick up cocaine. Accordingly, the trial court held that the conspiracy was responsible for more than 50, but less than 150, kilograms of cocaine.
 
 
 16
 Plescia, as head of the drug ring, was held responsible for the drug volume of the entire conspiracy, and was sentenced in the 50 to 150 kilogram sentencing range. He argues on appeal that the record only supports a finding of 45 kilograms, but his rationale is flawed. He points out that Rizzato admitted to having lied in the past, concludes that Rizzato's word alone is untrustworthy, and concedes that motel slips and mileage records corroborate eight trips to pick up 5 kilograms of cocaine and one to pick up 10 kilograms for a total of 45 kilograms. However, it is not for us to judge the credibility of witnesses. The defendants did their best to impeach Rizzato, including gaining his admission of previous lies, but the jury still found Rizzato credible, as did the trial court. The jury and the trial judge are best qualified to judge the credibility of witnesses appearing before them. Rizzato testified to having brought at least 55 kilograms from Florida to Chicago, and other couriers transported indefinite quantities beyond that amount. We affirm Plescia's sentence.
 
 
 17
 Bonavolante argues that since he did not join the conspiracy until 1988, he should not be held accountable for the entire volume handled by the conspiracy. We have earlier held that "The judge may sentence a late entrant on the basis of all the drugs distributed only if the earlier distributions occurred as part of the conspiracy to which the defendant agreed." Edwards, 945 F.2d at 1397. That seems to be the case here. In any event, we need not reexamine the question whether a conspirator may be held accountable for drug distributions before the conspirator joined the ring, for there is evidence of more than ten trips by different couriers to Florida to purchase cocaine after Bonavolante joined the conspiracy. Since Rizzato testified that he never picked up less than 5 kilograms of cocaine per trip, it is reasonable to infer that different conspirators picked up over 50 kilograms of cocaine after Bonavolante joined the conspiracy. Given Bonavolante's status as financier with whom Plescia split the profits, the quantity was reasonably foreseeable to him.
 
 
 18
 The trial court found that more than 20 kilograms of cocaine were reasonably foreseeable to Anthony Grossi. Since Rizzato, the Title III tapes, and the DEA agents' observation of Anthony's activities all indicate that he was an active participant in both the transportation and the distribution of cocaine and that he and Camillio Grossi worked together in holding and distributing the drugs, we find the trial court's conclusion amply supported by the record.
 
 
 19
 Unlike his codefendants, Camillio Grossi incurred his sentence under 21 U.S.C. Sec. 841(b)(1)(A), because he had a prior conviction for a felony drug offense. That statute imposes a minimum sentence of 240 months if any previously convicted felon commits another offense involving more than 5 kilograms of cocaine. Since this mandatory minimum sentence exceeds the Guidelines range (188-235 months) for conviction for a felony drug offense involving more than 50 kilograms, the evidence need indicate only that over five kilograms of cocaine were reasonably foreseeable to Camillio Grossi. The evidence demonstrates Grossi's active role as a regular distributor of cocaine and easily supports his sentence.
 
 
 20
 For the reasons given, we affirm the sentences of these four defendants. We consider Demma's sentence below.
 
 
 21
 III. Demma's Conspiracy Conviction and Sentence
 
 
 22
 Norman Demma argues on appeal, as he did at trial, that he was never a member of the conspiracy but merely in a buyer-seller relationship with Plescia. Demma correctly states that a buyer-seller transaction alone cannot support a conviction for conspiracy to distribute narcotics. United States v. Townsend, 924 F.2d 1385, 1394 (7th Cir.1991). Demma argues that his transactions with Plescia were isolated, and that neither had an interest in the other's drug activities beyond each purchase. However, the evidence against Demma indicates a significantly greater relationship between Demma and Plescia than Demma argues now.
 
 
 23
 Our circuit has held numerous times that "Evidence of frequent and repeated transactions, especially when credit arrangements are made, can support a conspiracy conviction. United States v. Dortch, 5 F.3d 1056 (7th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1077, 127 L.Ed.2d 394 (1994); United States v. Fort, 998 F.2d 542, 546 (7th Cir.1993); United States v. Edwards, 945 F.2d 1387, 1398, cert. denied, 503 U.S. 973, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992); [United States v. Sergio, 934 F.2d 875, 869 (7th Cir.1991) ]." United States v. Fagan, 35 F.3d 1203, 1206 (7th Cir.1994). A purchaser of drugs for redistribution need not be accountable as an employee to the seller for a jury to find that the purchaser had joined in and furthered a conspiracy to distribute narcotics.
 
 
 24
 It was up to the jury to determine whether [the defendant] had an ongoing relationship with other members of the conspiracy which would support the conclusion that he joined the agreement to distribute cocaine to the Windtramps. The jury was given a buyer-seller instruction; its verdict demonstrates that it rejected that interpretation of the facts. We cannot agree that the jury's conclusion was irrational or unsupported by probative evidence. Indeed, the evidence of an ongoing relationship in this case is even stronger than the evidence held to be sufficient in Fort. In Fort, there was only one completed transaction and a promise of future deals. [998 F.2d] at 543. Here, [the defendant] completed three transactions, and trial testimony established that a fourth would have occurred if the Windtramps had been able to locate him. This evidence suggests prolonged cooperation, indicating trust and "implying something more than a series of spot dealings at arm's length between dealers who have no interest in the success of each other's enterprise."
 
 
 25
 Dortch, 5 F.3d at 1066, quoting United States v. Lechuga, 994 F.2d 346, 349 (7th Cir.1993) (en banc). The Townsend court adds, "Evidence that the parties must negotiate the terms of every transaction, seek to maximize their gains at the expense of others, or engage in other forms of opportunistic behavior at the expense of the group, suggests that the transaction costs among the group are high and counsel against a finding of conspiracy between the members." Townsend, 924 F.2d at 1395.
 
 
 26
 In this case, Demma had bought cocaine from Plescia for years, ending only when the government broke up the drug ring. Demma bought in distribution quantities, not merely for personal use, and he arranged another purchase every three weeks to a month. On two occasions during the investigation, Plescia gave Demma cocaine on credit. Moreover, agents found Demma's home telephone number on a sheet of paper in Plescia's bedroom when they searched it. When Geiger, who was involved in the drug ring but apparently had no other connection with Demma, was stopped by DEA agents, Plescia called Demma's home six times in an attempt to warn him. Plescia also called Demma later at his home to set up a drug deal involving cocaine with a street value of $50,000. Nor was the relationship one-sided; after being chased and stopped by DEA agents, Demma called Plescia to warn him that DEA agents might be following him or might have wiretapped Plescia's phone or pager. Demma's long-term relationship with Plescia and his drug ring contradicts the claim that Demma was merely a casual buyer. Rather, the evidence supports the jury's conclusion that Demma was a conspirator with an interest in the success of the ring, who acted in furtherance of its illegal goals.
 
 
 27
 Moreover, this court established in Townsend that "limited participation can be probative of limited agreement" (924 F.2d at 1402) which nonetheless constitutes conspiracy, even if it is a more limited conspiracy than that charged by the government. Plainly, Demma's interaction with Plescia individually rises to the level of an ongoing agreement sufficient to constitute a conspiracy to distribute the drugs actually sold to and distributed by Demma. Townsend held that even if the evidence supported conviction for a different conspiracy than the one with which the defendant was charged and indicted, this court will affirm the conviction. 924 F.2d at 1402. Whether the Demma-Plescia agreement was a separate conspiracy or a part of the larger conspiracy run by Plescia is relevant to Demma's sentence, but the evidence fully justifies his conviction for conspiracy.
 
 
 28
 Demma's sentencing challenge, however, merits a closer examination. The judge sentenced Demma, like Plescia and Bonavolante, according to the entire volume of cocaine, more than 50 kilograms. Demma argues on appeal that he should not be held responsible for the entire volume of cocaine turned over by the larger conspiracy run by Plescia. Demma was involved in the conspiracy from its early days, making monthly or more frequent transactions over a period of years. He knew Plescia well, and since Plescia was willing to describe the scope of the drug ring to an undercover agent trying to buy cocaine, it is more likely than not that Demma knew the approximate volume of drugs Plescia bought and sold. Demma also knew Rizzato, the courier, and Camillio Grossi. However, Demma distributed relatively small quantities, and the government does not claim that he handled 50 kilograms himself.
 
 
 29
 The scope of conspirators' liability is determined by the scope of the agreement they actually entered, not necessarily by the total volume of a larger conspiracy. "Townsend requires a trial court to scrutinize the agreement that an individual defendant entered into to determine whether he actually agreed to become involved in a conspiracy to distribute a given quantity of drugs.... Townsend makes clear that conspiracy law contains an important limiting principle--namely, that conspiracy liability cannot exceed the scope of a defendant's agreement to further criminal activity." Edwards, 945 F.2d at 1396. While Demma clearly conspired to distribute illegal narcotics, his relative independence suggests that he may have conspired with Plescia to distribute some lesser amount than that distributed by the larger drug ring.
 
 
 30
 Our past decisions offer some guidance. In Townsend, an independent marijuana purchaser-dealer was held to be a conspirator in the overall marijuana conspiracy, but not the related cocaine and heroin conspiracies involving many of the same coconspirators. 924 F.2d at 1402. We see a closer parallel to Demma in United States v. Auerbach, 913 F.2d 407 (7th Cir.1990). The defendant in Auerbach claimed, like Demma, that as one of several purchasers from a drug ring, he did not take part in the larger conspiracy. This court disagreed.
 
 
 31
 The evidence established that Helish dealt continuously with [his supplier] throughout the spring and summer of 1985. His purchases were not discrete transactions requiring limited contact with the conspiracy; rather, they required an ongoing relationship that soured only when Helish failed to move the marijuana fast enough.... "[I]f each [defendant retailer] knew, or had reason to know, that other retailers were involved ... in a broad project for the smuggling, distribution and retail sale of narcotics, and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture, the jury could find that each had, in effect, agreed to participate in the overall scheme." United States v. Grier, 866 F.2d 908, 924 (7th Cir.1989).... "While the parties to the agreement must know that others are participating in the conspiracy, they neither have to personally know the individuals involved nor do they have to participate in every facet of the conspiracy scheme."
 
 
 32
 Auerbach, 913 F.2d at 415, quoting United States v. Adamo, 882 F.2d 1218, 1224 (7th Cir.1989). In Edwards, 945 F.2d at 1400, this court affirmed the conspiracy conviction of "an insubstantial supplier who made a late entrance into the conspiracy," reversing his sentence only in consideration of the short period of his participation.
 
 
 33
 Here, Demma's frequent large purchases over a long time made his venture dependent to a considerable extent upon the success of Plescia's operation. As the Auerbach court noted, " 'Separate conspiracies exist when each of the conspirators' agreements has its own end, and each constitutes an end in itself.' ... Here, there was no divergence between [the defendant]'s aims and those of the conspiracy; both sought to get the same [narcotics] into the hands of users on the street." 913 F.2d at 416. We affirm Demma's sentence, determined with reference to the volume of drugs involved in the overall Plescia conspiracy.
 
 
 34
 Finally, Demma challenges the forfeiture of his house, calling it inappropriate under forfeiture law and an excessive fine in violation of the Excessive Fines Clause of the Constitution. We find without extended discussion that the forfeiture was proper. Forfeiture of real estate is appropriate where the property is used in any way to facilitate any drug-related offense, unless the connection between the offense and the property is "incidental and fortuitous." United States v. 916 Douglas Ave., 903 F.2d 490, 493 (7th Cir.1990). The government claimed the house primarily on the basis of one phone call made by Plescia to Demma at his house in which the two set up a large cocaine transaction. There is no doubt that Demma used the privacy of his home to conduct drug-related business over the telephone, and he apparently gave his home number to Plescia so that he and others could contact Demma. The connection in this case is not incidental and fortuitous, but a fitting situation for forfeiture.
 
 
 35
 Because Demma did not make his Excessive Fines argument until this appeal, we review only for plain error. United States v. Olano, --- U.S. ----, ----, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993). No such error appears in this case. Although the Supreme Court has not articulated a clear standard by which to judge claims of excessive fines, Justice Scalia in a concurrence wrote, "the question is not how much the confiscated property is worth, but whether the confiscated property has a close relationship to the offense." Austin v. United States, --- U.S. ----, ----, 113 S.Ct. 2801, 2815, 125 L.Ed.2d 488 (1993) (Scalia, J., concurring). See also Alexander v. United States, --- U.S. ----, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993). We have already found such a connection, and even if we consider how much the property was worth, Demma's claim fails. While Demma attacks the forfeiture of the house for one lone phone call, the government replies that Demma's equity in his one-half interest in the house was worth around $30,000, while the drug deal arranged in the phone call concerned $50,000 worth of cocaine. Nor is there any reason to believe that this was most likely the only drug deal made from Demma's home. The government's power of forfeiture over the property used in illegal drug transactions is one of its harsher powers, but the fine levied on Norman Demma in this case is far from an extreme example of its use.
 
 IV. Other Contentions
 
 36
 The remainder of the defendants' arguments merit little discussion, so we briefly mention only a few. Several of the issues which defendants raise now were not properly preserved for appeal. An important example involves the defendants' expert witness on tapes and tape recordings. Plescia claims now that the expert testimony was crucial to Plescia's argument that the Title III surveillance tapes recorded by the government had been tampered with and should not be trusted. However, the pre-trial hearing on this issue revealed that the witness did not then intend to testify that he believed the tapes had been changed. His testimony regarding the technical aspects of the tapes was specialized and confusing, and the inferences Plescia wished to draw were speculative. Nonetheless, the district court did not then exclude the testimony. Instead, he invited the defendants to bring the witness to the stand during trial, so the judge could hear the questions and the government's objections before ruling on admissibility. The defendants never called their expert to the stand, and thus they waived their claim that his testimony should have been permitted. United States v. Addo, 989 F.2d 238, 242 (7th Cir.1993).
 
 
 37
 Similarly, Demma claims now that the court improperly refused to re-open the proofs at the end of the trial to allow him to testify. However, just after his lawyer made the motion, in the judge's chambers with only his own counsel and the judge, Demma refused to testify. Several times during the trial, Demma had been informed of his right to testify, he had discussed the issue with his lawyer at some length, and he always refused, thereby waiving the right.
 
 
 38
 Only Anthony Grossi preserved the argument for suppression of the Title III tapes. He argues that the district court should have suppressed the tapes because the government failed to seal them in a timely manner upon expiration of the permitted surveillance period as required by 18 U.S.C. Sec. 2518(8)(a). That section provides:
 
 
 39
 Immediately upon the expiration of the period of the order [authorizing the surveillance], or extensions thereof, ... recordings [made of the electronic surveillance] shall be made available to the judge issuing such order and sealed under his directions.
 
 
 40
 To determine whether the tapes should have been suppressed, "we must consider whether the Government established good cause for the sealing delays that occurred in this case." United States v. Ojeda Rios, 495 U.S. 257, 265, 110 S.Ct. 1845, 1850, 109 L.Ed.2d 224 (1990). The government notes first that because a second surveillance period followed the first, it was treated as an extension of the first, preventing any need for sealing between the periods. United States v. Carson, 969 F.2d 1480, 1488 (3d Cir.1992). Second, the government reasonably explains the delay between the periods as necessary to draft the Title III surveillance request affidavit and to get the request processed by the federal bureaucracy. Third, the government points out that it did seal the tapes two weeks after the end of the first period in a good-faith effort to comply with the statute in the face of an innocent delay in processing the request for a second surveillance period. We believe that the government has provided good cause for the delay and has fulfilled the demands of the sealing statute.
 
 
 41
 Other of the defendants' contentions are simply unsuccessful. Defendants argue that the Title III electronic surveillance was improper under 18 U.S.C. Sec. 2518(1)(c) because investigators had enough evidence without it and/or could have obtained sufficient evidence through ordinary investigative techniques. However, "[o]ur Circuit recognizes that 'the government's burden of establishing its compliance with [subsection 2518(1)(c) ] is not great,' and that the requirement that the government exhaust 'normal investigative procedures' be reviewed in a 'practical and common-sense fashion.' " United States v. Zambrana, 841 F.2d 1320, 1329 (7th Cir.1988) (citations omitted). From a practical perspective, the defendants' claim fails. Even if it were true that the government could have prosecuted Plescia without the tapes, the wiretaps both allowed the government to ascertain the extent and structure of the conspiracy and provided enough evidence to convict these five, the key players in the drug ring. It would have been far more difficult or impossible to determine the extent of their involvement, such as Bonavolante's role as financier, by merely observing transactions from a distance.
 
 
 42
 Plescia argues that tapes of his conversations with an informant, who did not testify at trial, should have been suppressed as hearsay. The informant's statements, however, were not offered for their truth, but only to give context to Plescia's own self-incriminating words. See United States v. Davis, 890 F.2d 1373, 1380 (7th Cir.1989).
 
 
 43
 The chief witness for the prosecution was the courier Rizzato, a Chicago police officer on disability who had been involved in the conspiracy from the beginning, with a brief hiatus from 1988 to 1989. The defendants claim that they were improperly limited in their attempts to impeach him several ways. First, they cross-examined him regarding several lies he had told while under oath in the past, lies with considerable detail and specificity. He admitted that he had in the past lied while under oath, and he admitted that his lies had been creative and detailed. However, the trial court refused to allow cross-examination into the details of the lies because their prejudicial effect would outweigh any probative value. Fed.R.Evid. 403. In fact, Rizzato had lied several times in telling people that he had killed African-American gang members in retaliation for the murder of his brother, also a Chicago police officer, by African-American gang members. Rizzato had also lied while under oath at a hearing in the Chicago Police Department regarding his positive drug test for cocaine. Rizzato had claimed that a woman he had met when feeling lonely and depressed had slipped him the drug, which he had thought was something else.
 
 
 44
 "[T]rial judges retain wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). Given that Rizzato freely admitted on the stand that he had lied in detailed ways while under oath, and given the prejudicial effect a claim of the murder of African-American gang members would have, we feel that further cross-examination into the details was unnecessary, probably prejudicial, and properly precluded. Rizzato willingly admitted his criminal activity while a police officer, his drug use, and the lies he told to conceal his illegal acts, and the jury found his frequently corroborated testimony credible regardless.
 
 
 45
 The trial judge also prevented the defendants from cross-examining Rizzato regarding certain anti-depressive and anti-anxiety medication, including Prozac, which he was taking at the time of trial and when the events he described had occurred. The defendants argue that these drugs could have affected Rizzato's perception and memory, but they did not offer any expert testimony regarding the effects of the medications either generally or on Rizzato. The trial judge correctly ruled that line of cross-examination more prejudicial and confusing than useful for impeachment, particularly because Prozac had often been mentioned negatively in popular media at that time.
 
 
 46
 Camillio Grossi and Bonavolante further attack the trial judge's decision not to allow their follow-up questions regarding Rizzato's brother-in-law, Carlo Plescia, in support of his defense theory that Rizzato had replaced Carlo Plescia, the real financier of the drug ring, with Grossi and Bonavolante, leader of a gambling ring, in an attempt to protect his sister's husband. Since Rizzato had testified that he did not remember the statement about which Bonavolante wanted to question him, follow-up questions were improper. Bonavolante and Grossi were not prejudiced, because Rizzato fully described his relationship with Carlo Plescia and implicated him in the drug conspiracy and because the defendants were able to present their substitution theory elsewhere.
 
 
 47
 Camillio Grossi and Bonavolante also wished to call a witness to testify that Rizzato told him he intended to substitute them for Carlo Plescia. However, the witness, who was also involved in the conspiracy, stated that he would plead the Fifth Amendment right against self-incrimination on cross-examination. The government demonstrated in a hearing that the witness would effectively preclude its impeachment of him for considerable bias and previous inconsistent statements by claiming the Fifth. The district court may refuse to permit a witness to testify when that witness' right against self-incrimination precludes effective cross-examination. United States v. Herrera-Medina, 853 F.2d 564, 567-68 (7th Cir.1988). The trial judge therefore properly refused to allow the witness to testify. Further, the defendants were not greatly disadvantaged. The witness could only have tried further to impeach Rizzato, but he could not have proven the substitution theory, because Rizzato's statements to the witness would represent impermissible hearsay if offered for their truth.
 
 
 48
 Plescia argues that the judge should have declared a mistrial because a DEA officer, mistaking him for another officer, asked him a question about the cocaine present as an exhibit. Plescia did not respond in any way. The judge questioned the jurors and determined that there is no indication that any juror overheard the very brief interaction. The judge properly instructed the jury immediately thereafter to consider only the evidence formally presented in the trial. A defendant is entitled to a new trial only if there is a "reasonable possibility" that the jury's verdict has been affected by material not properly admitted into evidence. United States v. Davis, 15 F.3d 1393, 1413 (7th Cir.1994). We review the district court's ruling for an abuse of discretion, "and, as an appellate court sitting one step removed from the trial, we shall reverse the district court's decision only if we have a very strong conviction of error." United States v. Sanders, 962 F.2d 660, 669 (7th Cir.1992) (citations omitted). We find that the district court committed no error, because there is no reasonable possibility that the jury was affected by the exchange.
 
 
 49
 This was a long and complex trial. In such a trial it is almost inevitable that some error or at least questionable ruling may occur during the course of it. It is equally true, however, that the adverse impact upon a jury of such rulings, where otherwise isolated, is diminished in proportion to the length of the trial so that "while every additional day of trial increases the possibility of error, it correspondingly reduces the risk that any single error may have prejudicial effect upon the result." Cf. In re Beverly Hills Fire Litigation, 695 F.2d 207, 227 (6th Cir.1982). That observation is particularly true here. As a whole, the trial was conducted in an orderly fashion and with conscientious regard for the defendants' rights. Nothing we have seen in the record here undermines our belief that the defendants received a fair trial, were properly found guilty and were sentenced appropriately. Accordingly, we AFFIRM.
 
 
 
 *
 Honorable Albert J. Engel, of the United States Court of Appeals for the Sixth Circuit, sitting by designation