MEMORANDUM AND ORDER

MALETZ, Judge, Sitting by Designation.
On June 29, 1996, a jury convicted the defendant, Philip Manglitz of one count of conspiracy with the intent to distribute marijuana in violation of 21 U.S.C. § 846, one count of conspiracy to engage in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1956(h) and four counts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957. The jury acquitted the defendant of possession with the intent to distribute marijuana in violation of 21 U.S.C. § 841 and could not reach a verdict on two additional counts charging violations of 18 U.S.C. § 1957. Following his conviction, the defendant timely filed a motion for an expansion of time to file a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure and timely filed his Rule 33 motion within the expanded time period set by the court. For the reasons set forth below, the motion for new trial will be denied.
The defendant bases his motion for new trial on claims of prosecutorial misconduct during the course of the trial. The defendant claims that the prosecution violated his rights in four manners: (1) the introduction and improper use of prior bad acts in violation of Federal Rule of Evidence 404(b); (2) the distortion and misstatement of critical facts during the prosecution’s closing argument; (3) improper comment upon the defendant’s failure to testily; and (4) failure of the prosecution to provide discovery required under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In assessing claims of prosecutorial misconduct, the Fourth Circuit has instructed,
The test for reversible prosecutorial misconduct generally has two components: that (1) the prosecutor’s remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant’s substantial rights so as to deprive the defendant of a fair trial.
United States v. Mitchell, 1 F.3d 235, 240 (4th Cir.1993) (citations omitted).
The defendant’s first claim is that the government violated Rule 404(b) by (1) introducing evidence that the defendant had discussed with Dana Kleberg, a cooperating co-defendant, his own previous drug dealing, (2) using the term “bank fraud” during the redirect examination of Ronald Carter, another cooperating co-defendant, (3) proffering tax evasion as a motive for the defendant’s alleged criminal activity and (4) alleging that the defendant had engaged in obstruction of justice both previously when he paid James Lee to “keep quiet” about Mr. Manglitz’s role in his prior drug dealing during Mr. Lee’s incarceration and contemporaneously when he disposed of cash in his home. None of these four allegations, separately or taken together, meet the burden set forth in Mitchell in order to make a new trial appropriate.
One of the most hotly contested elements during the defendant’s trial was his knowledge that the funds he was receiving from Dana Kleberg and Randolph Ayersman were the proceeds of specified illegal activity, to wit, marijuana distribution. To that end, prior to the beginning of the trial, the court held that the government would not be precluded from introducing evidence through Mr. Kleberg and Mr. Ayersman that the *1214 defendant had told each of them he had previously been engaged in the distribution of marijuana. The court held that the government would be precluded from introducing detailed testimony about the nature or extent of the defendant’s prior drug dealing, in order to avoid undue delay or unnecessary prejudice to the defendant. The court had previously ruled that the government would be precluded from introducing tapes where the defendant discussed his prior arrest for the possession with the intent to distribute fifty pounds of marijuana in Laredo, Texas, because the “risk that the jury will be excited to irrational behavior by such specific evidence of Mr. Manglitz’s past drug trafficking activities is disproportionate to the probative value of such evidence.” United States v. Manglitz, No. S-95-0314, slip opinion at p. 10 (D.Md. Jan. 25,1996).
At trial, the government introduced evidence that during a flight from Acapulco to the United States, Mr. Manglitz discussed his prior drug dealing with Mr. Kleberg. When Mr. Kleberg testified that Mr. Man-glitz admitted that he had been “arrested down on the Texas-Mexiean border,” the court sustained an objection by the defense, ordered the testimony stricken from the record and cautioned “you are very close.” It was not improper for the government to introduce evidence that Mr. Manglitz brought up his knowledge of the methods and means of drug dealing in order to prove that he had knowledge that the money he was obtaining from Mr. Kleberg was the proceeds of marijuana trafficking. The government erred when it introduced testimony about Mr. Manglitz’s arrest, but the eourt took great pains to prevent any unfair prejudice to the defendant from any mention of his previous arrest, by striking the testimony and giving an immediate cautionary instruction to the jury. These actions were sufficient to dissipate the harm to the defendant. Richardson v. Marsh, 481 U.S. 200, 210, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987) (“ju-ríes are presumed to follow their instructions”).
The defendant’s next claim is that he was prejudiced by the government’s introduction of the term “bank fraud” during the re-direct examination of Ronald Carter. Mr. Carter testified on direct examination that he had not signed some of the deeds which bore his name. On cross-examination, he testified that the defendant had removed himself as a partner in Carman Associates, the entity which owned the properties sold to Mr. Kle-berg and Mr. Ayersman, during 1991. On re-direct examination, the government introduced through.Mr. Carter documents signed by the defendant during 1991 which identified him as a general partner in Carman Associates. At this point, the government asked whether Mr. Carter was familiar with the term “bank fraud,” After Mr. Carter indicated that he was, the government did not further develop this line of questions.
The reference to “bank fraud” does not fall within the purview of Rule 404(b), because the “bank fraud” referred to occurred during and as a part of the charged money laundering.[1] “Evidence of uncharged conduct is not considered ‘other crimes’ evidence if it arose out of the same series of transactions as the charged offense, or if it is necessary to complete the story of the crime on trial.” United States v. Kennedy, 32 F.3d 876, 885 (4th Cir.1994), cert. denied, — U.S. -, 115 S.Ct. 939, 130 L.Ed.2d 883 (1995). The government did not introduce extrinsic evidence of bank fraud, but rather placed the “bank fraud” label on evidence which was already properly before the jury. This did not constitute prosecutorial misconduct.
The defendant claims that the government engaged in reversible misconduct by speculating that the defendant engaged in his money laundering activity in order to evade taxes. Throughout trial, the government established that there are large amounts of cash generated by the sale of narcotics, and that such cash is exceedingly difficult to use, *1215 because of governmental scrutiny of large cash transactions. The government introduced extensive evidence at trial that the defendant sold property to Mr. Ayersman and Mr. Kleberg, who were generating large amounts of cash through the distribution of marijuana. The government introduced evidence that payment was made through a combination of cash and certified checks, but that the sale price recorded on the deeds reflected only the value of the certified checks tendered. The evidence introduced by the government also established that the total sale price of these lots was at or near the original asking price for the property.
During closing argument, the defendant raised a series of questions to be answered by the government. The defendant specifically asked the government what motive the defendant would have to accept cash generated by drug sales at full value, when such funds were so difficult to spend. The defendant also repeatedly asked the government to explain why no IRS action was taken against Mr. Manglitz, when a representative of the IRS was at the government’s counsel table throughout the trial. The government responded:
Remember, ladies and gentlemen, he was a developer, a developer of lots, building lots. He took the cash. It reduced the selling price of the lot, the asking price of the lot, it reduced the sale price of the lot, the price it was sold for, it showed less income for the business, for the company. He might declare a loss. He might show a loss or a very little bit of profit. So it made perfect sense for Philip Manglitz as well.
The defendant objects to this statement for two reasons: (1) the defendant was never charged with any tax offense and (2) there was no evidence submitted about the taxes, profits or losses claimed by the defendant. As the defendant did not make a contemporaneous objection to this argument, we review only for plain error. The plain error rule is to be used “sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” Young, 470 U.S. at 15, 105 S.Ct. at 1046 (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982)).
The argument quoted above does not constitute plain error. The defendant clearly focused the jury’s attention on the question of motive. Given the evidence that the defendant was under-reporting the sale price of the lots on the deeds and bank records recorded, it was fair argument for the government to contend that the defendant intended to reduce the ostensible selling price of the lots. United States v. Robinson, 485 U.S. 25, 33, 108 S.Ct. 864, 869-70, 99 L.Ed.2d 23 (1988) (government permitted to make “fair response” to specific argument posed by defendant in closing).
To the extent that the government engaged in speculation by stating that the defendant “might have shown a loss or a very little bit of profit,” this did not constitute plain error. First, the jury was specifically instructed that it was not to engage in speculation, and that the argument of counsel was not to be considered as evidence. Second, the jury returned a mixed verdict, unable to reach a conclusion on two of the counts of money laundering in addition to acquitting the defendant of possession with the intent to distribute marijuana. Such a mixed verdict “demonstrates [the jury] sifted carefully through all the evidence.” United States v. Aramony, 88 F.3d 1369, 1379 n. 5 (4th Cir.1996); United States v. Porter, 821 F.2d 968, 972 (4th Cir.1987) (“Convictions should be sustained if it may be inferred from the verdicts that the jury meticulously sifted the evidence.”), cert. denied, 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1988).
The defendant claims that the government inappropriately accused him of two instances of obstruction of justice. First, the defendant argues that the government engaged in reversible misconduct by contending that he had paid James Lee $1,000 to remain silent about the defendant’s role in Mr. Lee’s narcotics distribution. During the trial, James Lee testified that during the period of time in the 1980s he was incarcerated in Hagerstown, Maryland, he received $1,000 from the defendant. He further testified that he and the defendant did not have *1216 an understanding about the reason the defendant was sending him the money. Notwithstanding this testimony, the government attempted to show that there was an understanding between the defendant and Mr. Lee by introducing into evidence a tape recording where the defendant told Dana Kleberg:
Manglitz: Well Dana, I told Randy this and I tell you this, if you guys come through stand up guys, right, and you don’t roll over, I’m gonna bend over backwards to help you do whatever you wanna do, help you do whatever it takes, okay? So if ah, if you were gonna go away for a year, two years, I don’t think it’s going to happen with 3]é pounds.
Kleberg: Well, it’s a possibility.
Manglitz: It is, but I don’t think there is, but if you were, I’d work something out to ah, ah, borrow money from you, and pay interest on it, okay? Legal paperwork and stuff like that you can put away and watch you money grow as you sitting fat eat, I’ll send you money while you’re in there you know
Kleberg: Toothbrush, and ...
Manglitz: Everything, you can buy sneakers while you’re in there when your sneakers wear out. All sorts of things ... this guy up in Hagerstown was even telling me he can buy a T.V. I sent him a thousand bucks ... Years ago, when, when he went down for, for a couple keys of coke, and ah, I sent him money for a T.V. He was top dog in there you know. If you got money to draw, most of the guys that go in there have gotten wiped out of everything.
Based upon this evidence, the government argued that the defendant was offering to pay Mr. Kleberg and Mr. Ayersman to go to jail without “rolling over” on him, and that the defendant had attempted to prove his bona fides in making this offer by informing Mr. Kleberg that he had earlier entered into a similar deal with Mr. Lee. The defendant timely objected to this argument, and the court overruled the objection stating, “Again, ladies and gentlemen, this is argument and, again, without placing the imprimatur of the court as to whether this a correct argument or not, I will leave that to you, and let the argument stand.” The court will adhere to this ruling, as it was a permissible inference for the jury that the $1,000 given to Mr. Lee was given for his silence, and that the tape recording captured the defendant making a similar offer to Mr. Kleberg.
The defendant argues that the government overstepped fair argument at the conclusion of the argument. The government concluded:
He was offering to pay them, if they got locked up, to keep quiet. Ladies and gentlemen, tell Philip Manglitz that he can’t buy his way out of this one. Tell him that the evidence shows beyond a reasonable doubt, tell him that he is guilty on all counts.
As the court has already stated, it was proper argument for the government to contend that the defendant was offering to pay Mr. Kleberg and Mr. Ayersman to remain silent. More problematic is the government’s admonition to the jury to tell the defendant “he can’t buy his way out of this one.” This statement clearly implied that the jury should convict the defendant because he had previously successfully evaded prosecution for drug trafficking by paying Mr. Lee to remain silent. Courts have held that it is improper argument for the prosecutor to urge the jury to convict based upon extrinsic evidence, Mitchell, 1 F.3d at 240, or to “send a message”. United States v. Wiedyk, 71 F.3d 602, 608 (6th Cir.1995); United States v. Badger, 983 F.2d 1443, 1456 (7th Cir.), cert. denied, 508 U.S. 928, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993) and cert. denied, 510 U.S. 820, 114 S.Ct. 76, 126 L.Ed.2d 44 (1993); United States v. Solivan, 937 F.2d 1146, 1150 (6th Cir.1991). As there was no objection to this statement, the court will order a new trial only if the comments constituted plain error. Young, 470 U.S. at 15, 105 S.Ct. at 1046.
The court finds that the challenged statement does not reach the level of harmful error, let alone plain error. Applying the four factors stated in Mitchell, 1 F.3d at 240, the court finds that the statements did not *1217 “so prejudice the trial process as to require reversal.” Id. at 241. Although the comments came at the close of the government’s argument, a factor which weighs towards finding prejudice, id. at 243 (court must determine whether comments were deliberately placed before the jury), it was immediately followed by the government’s refocusing on the jury on the evidence, “Tell him that the evidence shows beyond a reasonable doubt, tell him that he is guilty on all counts.” Moreover, as noted above, the jury, through its mixed verdict showed an ability to sift through and evaluate the evidence without undue passion or prejudice. Aramony, 88 F.3d at 1379 n. 5. Finally, the jury was specifically instructed that it was to consider only the charges included in the indictment, and that the evidence of other bad acts had been admitted only for limited purposes, such as showing knowledge or intent. Richardson, 481 U.S. at 210, 107 S.Ct. at 1709 (“juries are presumed to follow their instructions”); Mitchell, 1 F.3d at 243 (limiting instructions reduce prejudice from improper argument).
The defendant claims that the government committed reversible error by arguing that the defendant had tampered with evidence. During his summation, the defendant included in his list of questions posed to the prosecution a query as to why no cash had been found in the defendant’s home during a search by the police. The government responded by stating:
Government: ... You heard what Agent Forletta told you on the stand as an expert witness what happens when people know that someone in their group has been arrested, get rid of it, conceal it.
Defendant: Objection.
Court: Overruled.
Government: It is gone, ladies and gentlemen. That is why we don’t have it. It is gone.
The government overstated the testimony which Agent Forletta was permitted to give. The court allowed Agent Forletta to testify that drug traffickers often conceal evidence after a co-conspirator has been arrested. However, the court precluded Agent Forletta from testifying that drug traffickers often destroy evidence in similar situations, based upon a stipulation by counsel that there was “no evidence in the record that the defendant, Mr. Manglitz, ever destroyed any pertinent evidence or any evidence.” Moreover, in the government’s final statement, “That is why we don’t have it. It is gone,” the prosecutor appears to be stating his personal knowledge that the cash did exist at one time, but that the defendant moved or destroyed it after Mr. Kleberg and Mr. Ayers-man were arrested.
It is axiomatic that a prosecutor is precluded from arguing facts which are not in evidence or from expressing a personal opinion about the evidence. Young, 470 U.S. at 18,105 S.Ct. at 1047-48. “Such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant’s right to be tried solely on the basis of the evidence presented to the jury.” Id. The government’s comments which indicated that Mr. Manglitz had destroyed evidence, despite the earlier stipulation that there was no evidence introduced at trial to support such an allegation, were inappropriate.[2] However, the court finds that this inappropriate comment does not, under Mitchell, require a new trial. The court bases this ruling upon the cautionary instructions given by the court, Mitchell, 1 F.3d at 243, the mixed verdict returned by the jury, Aramony, 88 F.3d at 1379 n. 5, and the fact that the comment came in direct response to the query of the defendant. Robinson, 485 U.S. at 33, 108 S.Ct. at 869-70.
The defendant’s next claim is based upon the alleged miseharaeterization of the testimony of Duncan Forest. Mr. Forest testified that he received a cash loan from the defendant in the amount of $25,000. He testified that he received the money in “ap *1218 proximately five stacks of bills” in a “brown paper bag.” Mr. Kleberg and Mr. Ayersman each testified that they gave cash to the defendant in brown paper bags, with the cash stacked in bundles of thousand dollars, with one stack often including $5,000. Both Mr. Ayersman and Mr. Kleberg signed a brown paper bag, exhibit 69, which was accepted as an illustrative exhibit.[3] Special Agent For-letta testified that drug traffickers often used multi-thousand dollar bundles to transfer large amounts of cash. Based upon this evidence, the government argued:
He [Duncan Forest] told you Philip Man-glitz brought him that money in Texas, in Austin, Texas, and it was bundled in thousand dollar bundles, exactly the way described by Kevin Antonacci, Robert Vivian, Dana Kleberg, and Randolph Ayersman. Thousand dollars bundles in Government’s Exhibit Number 69, in a brown paper bag. I submit to you, ladies and gentlemen, that that brown paper bag of $25,000 cash, in those thousand dollar bundles, that Duncan Forest testified that he took directly from Philip Manglitz proves Philip Man-glitz was taking cash from Randy Ayers-man and Dana Kleberg.
The defendant claims that this misstates the record, because Mr. Forest did not testify to thousand dollar bundles nor did he specifically agree that government exhibit 69 resembled the brown paper bag which he received from the defendant. The court finds that these statements were within the ambit of fair argument based upon the evidence, and therefore, did not constitute prosecutorial misconduct.
The defendant’s next claim is that the government misstated the record in claiming that Jack Cooper, an attorney who was a partner with the defendant in some real estate holdings, was not present during the final encounter between Dana Kleberg and the defendant before the defendant’s arrest. The evidence at trial showed that Mr. Man-glitz directed that this meeting would take place in Mr. Cooper’s office.
One of the questions which the defendant posed to the government during closing argument was why would the defendant arrange for the meeting to occur at a lawyer’s office if he was intending to engage in a criminal act. The government responded,
Why at Cooper’s office? [Defense counsel] want to know why meet at the lawyer’s office? Why go to Mr. Cooper’s office? Why? Why not? Cooper is not there. No one said Cooper was there. Cooper wasn’t even there.
Dana Kleberg’s testimony fully supported this argument. Mr. Kleberg testified on cross-examination, “There wasn’t a lawyer there_ I never saw a lawyer at the office. When we went into the conference room, it was just Mr. Manglitz, Mr. Carter and myself.” There was nothing inappropriate about this argument by the government.
The defendant next asserts that the government inappropriately commented on his failure to take the witness stand during summation. At least four times during the defense summation, the defendant asked the government to explain why the defendant had refused to accept the $100,000 cash loan which Dana Kleberg offered him immediately before the defendant’s arrest. The government responded:
What happened when they got to Mr. Cooper’s office? Mr. Jack Cooper’s office, what happened when they got there in the parking lot? Philip Manglitz looks at the cash. Let’s see it. Let’s look at that cash. Let’s look at it. Big bills, little bills. He doesn’t say, let’s the see the date on the check. He doesn’t say that. Little bills, big bills. It is on the tape, ladies and gentlemen. He saw the money. He knew it was cash and he was ready to take it. Who knows? Only one person knows. Only person in the world who knows and that is Philip Manglitz, he knows. I don’t know.
The defendant immediately raised an objection, which the court overruled. The govern *1219 ment then speculated on reasons, other than lack of knowledge that the loan was to be given in cash, why the defendant may have backed out at the last minute. Some of these reasons were phrased in the first person, from the defendant’s perspective.
What went wrong? Something is wrong here. I just don’t feel right. I am calling this off. I am calling it off. I am not taking the cash. Cash? I didn’t know it was cash. I thought it was a check. Baloney. That is absolute baloney, ladies and gentlemen. That is why he didn’t take the cash. Listen to the tape. He knew it was cash. Cash. Baloney.
When the government reached the end of that section of its summation, the court gave a cautionary instruction.
I do want to interrupt for one moment. There was an objection the court overruled. And, I, at this juncture, after completion of this phase of the government’s argument in rebuttal, [the government] has argued that he, Mr. Manglitz, knows that. If there is any suggestion in that argument that you should draw any inference from the failure of Mr. Manglitz to testify that would be totally improper. I did not get that suggestion but possibly you could. There is no obligation on the part of Mr. Manglitz to testify, as I will instruct you, and this is terribly important, no inference whatsoever may be drawn from the fact that Mr. Manglitz did not take the stand and testify. None whatsoever. He has no burden whatsoever of presenting any testimony. The burden is totally on the part of the government of proving each ... essential element of the case, beyond a reasonable doubt.
Following this comment by the court, the government then made the following statement, which also drew objection from the defendant:
I did not mean to suggest that in any way, ladies and gentlemen. The government’s burden here is a very heavy one, extremely heavy. The government must prove its case beyond a reasonable doubt but, we accept that burden. We accept it everyday. We come in here to prove things to you, beyond a reasonable doubt, with evidence. With evidence. And that is what I ask you do, ladies and gentlemen, look at the evidence. Use your common sense and look at the evidence, and we have met that burden. I don’t mean to suggest anything else to you about the defendant not taking the stand.
In response to the defendant’s objection, the court asked the government to “Repeat what you just said. I don’t want to emphasize it but I have an objection [before me].” The government responded, “I don’t want to suggest anything to you about Mr. Manglitz not taking the stand. I did not suggest that and I will not suggest that to you.” The court then restated that, “I can’t be more positive about considering ... improper any suggestion by counsel for the government with respect to the defendant, Mr. Manglitz, not having taken the stand.”
The Fifth Amendment to the Constitution “forbids either comment by the prosecution on the accused’s silence or instructions by the court that such silence is evidence of guilt.” Griffin v. California, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). Where the prosecution does not directly comment upon the failure of the defendant to testify, the court must determine, “Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify?” United States v. Francis, 82 F.3d 77, 78 (4th Cir.) (quoting United States v. Anderson, 481 F.2d 685, 701 (4th Cir.1973), aff'd, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974)), cert. denied, — U.S. -, 116 S.Ct. 2513, 135 L.Ed.2d 202 (1996).
Although the court did not believe that the statements by the government violated the Anderson test, out of an abundance of caution, the court treated the statements as if they had and gave immediate cautionary instructions to the jury. Cf. United States v. Carroll, 678 F.2d 1208, 1209-10 (4th Cir.1982) (cautionary instruction 30 minutes after improper statement and after the court had initially admonished the defendant for raising an objection ineffective to remove taint of improper comment on defendant’s failure to testify). Even if taken as a comment on the *1220 defendant’s failure to testify, the government’s argument came in response to the defendant’s express invitation for the government to explain why the defendant did not take the $100,000 cash. “It is one thing to hold, as we did in Griffin, that the prosecutor may not treat a defendant’s exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge, as defendant does here, that the same reasoning would prohibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence.” Robinson, 485 U.S. at 33, 108 S.Ct. at 870. The defendant called upon the government to explain his actions immediately prior to arrest. The government responded by pointing to evidence which indicated that all reasonable explanations of the defendant’s conduct were consistent only with guilt, but refusing to make an absolute declaration of what motivated the defendant, as the workings of his mind are known only to him. Under Robinson, especially given the repeated and emphatic cautionary instructions of the court, the defendant’s rights under the Fifth Amendment were not abridged.
The defendant’s final argument is that he was deprived of a fair trial by the prosecution’s failure to produce material subject to disclosure under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, the Brady material was turned over to the defendant during trial on the direction of the court.[4] “No due process violation occurs as long as Brady material is disclosed to a defendant in time for its effective use at trial.” United States v. Smith Grading and Paving, Inc., 760 F.2d 527, 532 (4th Cir.), cert. denied, 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 457 (1985). The defendant acknowledges that the Brady material was produced prior to the cross-examination of the relevant witnesses. Moreover, the court allowed the defendant to recall witnesses for further cross-examination based upon the late arriving Brady material. The defendant now claims that “the statement could have served as the basis for investigating potentially exculpatory leads,” but does not identify any such leads and did not request a continuance at the time the Brady material was produced. The Brady discovery, although not perfect, did not deny the defendant a fair trial.
The Constitution guarantees the defendant a fair trial, not a perfect one. United States v. Blevins, 960 F.2d 1252,1254 (4th Cir.1992). The court has considered each of the claims of prosecutorial misconduct made by the defendant and finds that none of them, considered separately or together, warrants that the convictions obtained be set aside and a new trial be ordered. For all the reasons set forth above, the motion of the defendant for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure will be denied.

. The defendant did not make a contemporaneous objection to the use of the term "bank fraud." Therefore, under Federal Rule of Criminal Procedure 52(b), the defendant can only prevail on this point if the introduction of the term "bank fraud” constituted plain error. United States v. Young, 470 U.S. 1, 14-15, 105 S.Ct. 1038, 1045-46, 84 L.Ed.2d 1 (1985). The court finds that the introduction of the term "bank fraud” was not error at all, let alone plain error.

. The court will treat the objection interposed by the defendant as relating to the second, as well as the first comment by the government.

. Mr. Forest did not sign exhibit 69, although the government stated in closing argument that he had. The jury was informed prior to the beginning of deliberations that the parties had stipulated that the government was in error when it claimed that Mr. Forest had signed the bag. There was no prejudice from this misstatement.

. "The fact that disclosure came from a source other than the prosecutor is of no consequence. When determining the constitutional validity of a belated Brady disclosure, the relevant inquiry is solely whether the defendant was able to effectively use the exculpatory information.” United States v. Smith Grading and Paving, Inc., 760 F.2d 527, 532 n. 6 (4th Cir.), cert. denied, 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 457 (1985).